**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

ENTERED
08/27/2020

| | | |
|---|---|---|
| IN RE: | § | |
| BIANCA CRUZ | § | CASE NO: 18-10208 |
| Debtor | § | |
| | § | CHAPTER 7 |

<u>**MEMORANDUM OPINION**</u>

When lawyers compromise ethics for expediency, the results are predictable. The Court pens this Memorandum Opinion to underscore the importance of lawyers knowing the difference between what they can and what they should do when representing a client in any proceeding before this Court. Ethics should be a lawyer's highest calling after all.

In the case sub judice, the United States Trustee for Region 7 filed a Motion to (1) Examine Debtor's Transactions with Attorneys; (2) Cancel Debtor's Agreement with Attorneys; (3) Disallow and Order Disgorgement of Excessive Fees; and (4) Impose Sanctions Against Attorneys. Additionally, this Court, sua sponte, issued its own show cause order as against Marina R. Dominguez and David M. Menditto as to why each of them should not be held in contempt of this Court's prior order requiring the turnover to the Court of Exhibit No. 11 containing Debtor's purported original wet signature and date on the petition.

As discussed more fully below, the Court finds that (i) the Court's Show Cause Order was ultimately satisfied and neither Marina R. Dominguez nor David M. Menditto are held in contempt of court; (ii) fees paid to UpRight Law in the amount of $2,825 are disgorged, UpRight Law and Marina R. Dominguez must refund the sum of $1,891.50 (representing the fees Cruz paid UpRight Law, less amounts already refunded and filing fee) in good and sufficient funds, to Bianca Cruz within thirty (30) days of the entry of this Order, and proof satisfactory to Debtor and her current counsel that the $1,891.50 has already been refunded to Cruz will demonstrate

compliance with this portion of the order; (iii) a compensatory sanction in the amount of $8,475 will be imposed jointly and severally on Deighan Law, LLC and Marina R. Dominguez which must be paid to Bianca Cruz, by and through her counsel Marcos D. Oliva of Oliva Law, 223 W. Nolana Blvd. McAllen Texas, 78504 within thirty (30) days from the entry of this Court's Order; (iv) post-judgment interest shall accrue at the rate of 0.13% from the payment dates set forth above until paid; (v) the Court will set a hearing for  Deighan Law, LLC, f/k/a Law Solutions Chicago LLC d/b/a UpRight Law LLC, Allen Chern Law LLC and Marina R. Dominguez to appear and show cause as to why each should be permitted to continue to practice before the undersigned judge; (vi) as for Marina R. Dominguez, the Court will refer this matter to the Chief United States District Judge for the Southern District of Texas for further disciplinary proceedings in accordance with the Rules of Discipline of the United States District Court for the Southern District of Texas; and (vii) lastly, a copy of this opinion and associated judgment will be delivered to the Office of Chief Disciplinary Counsel for the State Bar of Texas and the Hon. David Jones, Chief Judge, United States Bankruptcy Court, Southern District of Texas.

## I.     FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to contested matters pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such.  To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such.  The Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions.  If there is an inconsistency, this Memorandum Opinion controls.

## A. Background History

On July 18, 2018, Bianca Cruz ("*Cruz*" or "*Debtor*") filed a Chapter 7 bankruptcy petition ("*Petition*").[1]  The Petition consisted of the Official Form 101 and a creditor matrix for a total of nine pages.[2]  The attorneys in this case are Marina R. Dominguez ("*Dominguez*"), who was Debtor's former counsel, and Deighan Law, LLC f/n/a Law Solutions Chicago, LLC, d/b/a UpRight Law LLC, d/b/a Chern Law LLC ("*UpRight Law*").[3]  The next pleading filed was a Motion to Substitute Attorney in which Debtor sought to terminate the attorney-client relationship between her and her attorneys.[4]  Debtor's request was granted and soon thereafter, Schedules and Statement of Financial Affairs were filed.[5]

On September 14, 2018, the United States Trustee ("*U.S. Trustee*") for Region 7 filed the instant Motion of the United States Trustee for the Court to (1) Examine Debtor's Transactions With Attorneys; (2) Cancel Debtor's Agreement With Attorneys; (3) Disallow and Order Disgorgement of Excessive Fees; and (4) Impose Sanctions Against Attorneys (the "*Motion*").[6]  On November 2, 2018, and December 6, 2018, the Court held hearings on the Motion.  At the December 6, 2018 hearing the Court ordered David M. Menditto ("*Menditto*") of UpRight Law

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

[2] ECF No. 1.

[3] *Id.* (The attorney of record for the Debtor on the Petition was Marina R. Dominguez of Allen Churn Law, LLC located at 5525 N. McColl Road, McAllen, Texas 78504); ECF No. 157, Deighan Law LLC is the current name of the law firm that previously did business under the name Law Solutions Chicago LLC, and which was registered to do business in the State of Texas as Chern Law LLC. Law Solutions Chicago, LLC is an Illinois limited liability company.  ECF No. 46 at 5. Prior to that, Law Solutions Chicago, LLC did business in the State of Texas and was commonly known as UpRight Law and solicited prospective clients over the internet by using the website www.uprightlaw.com.  *Id.* at 6. Law Solutions Chicago, LLC is authorized to provide legal services in Texas through Allen Chern Law LLC.  *Id.*  Allen Chern Law LLC has changed its name to Chern Law LLC, and Chern Law LLC is the registered assumed name by which Law Solutions Chicago, LLC provides services in Texas.  *Id.* at 5–6.  Allen Chern Law LLC is the previous registered assumed name by which Law Solutions Chicago, LLC provided services in Texas.  *Id.*  On May 16, 2019, the Office of the Secretary of State of Texas issued a Certificate of Amended Registration changing the name under which the firm does business in the State of Texas to Deighan Law LLC.

[4] ECF No. 12.

[5] ECF Nos. 18–22.

[6] ECF No. 27.

and Dominguez to turn over to the Court, UpRight Law's Exhibit No. 11 which consisted of the originally signed and dated Petition.[7]  The Court was seeking turnover of Exhibit 11 in order to more closely examine Debtor's original wet signature and date on the Petition which came into question during trial.[8]  On December 27, 2018, the Court issued, sua sponte, its Order to Show Cause Why Menditto and Dominguez Should Not be Held in Contempt ("*Show Cause Order*") after no such documents were forthcoming.[9]

     The U.S. Trustee's Motion along with this Court's Show Cause Order were tried before this Court over a period of four days, commencing November 2, 2018 and concluding on April 26, 2019.  On December 6, 2018, post-trial briefing was ordered by the Court but then the entire proceeding was abated on January 4, 2019, on motion by the U.S. Trustee due a temporary lapse in appropriations.[10]  On February 8, 2019, the Court held a status conference and reopened evidence nonetheless the order abating briefing remained in place.  On March 6, 2018, hearings resumed on the two matters and concluded on April 26, 2019.

     On July 29, 2019, the Court held a status conference regarding the previously abated briefing deadlines and issued a new briefing scheduling order.  After granting several extensions regarding the Court's briefing scheduling order, briefing has now closed and the parties have submitted their post-trial briefs.  In consideration of the arguments presented in the hearings on this matter, all other evidence in the record, credibility of the witnesses, and relevant case law, the matter is now ripe for determination and the Court issues the instant Memorandum Opinion.

### B. Joint List of Stipulated and Disputed Facts

     On December 19, 2019, the parties filed a Joint List of Stipulated and Disputed Facts.[11]

---

[7] Min. Entry Dec. 6, 2018; UpRight Law's Ex. 11.
[8] ECF No. 72.
[9] *Id.*
[10] ECF No. 80.
[11] ECF No. 157.

1. The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district under 28 U.S.C. § 1408. ECF No. 65, ¶ 1.

2. The Court has constitutional authority to enter a final order in this matter. If it is determined that the bankruptcy judge does not have the constitutional authority to enter a final order or judgment in this matter, the Parties consent to the entry of a final order or judgment by this Court in this matter. ECF No. 65, ¶ 2.

### United States Trustee

3. Henry G. Hobbs is the duly appointed Acting United States Trustee for Region 7 ("United States Trustee"), which includes the Southern District of Texas. 28 U.S.C. § 581(a)(7). ECF No, 65, ¶ 3.

4. Pursuant to 11 U.S.C. § 307, the United States Trustee has standing to raise, appear and be heard on any issue in a case or proceeding under the Bankruptcy Code. ECF No. 65, ¶ 4.

5. Pursuant to 28 U.S.C. § 586(a)(3), the United States Trustee is statutorily obligated to monitor the administration of cases commenced under the Bankruptcy Code, 11 U.S.C. § 101 *et seq*. Specifically, the United States Trustee is charged with a number of supervisory responsibilities in liquidation bankruptcy cases under chapter 7 of the Bankruptcy Code, including monitoring the progress of such cases and taking such actions as the United States Trustee deems to be appropriate to prevent undue delay in such progress. 28 U.S.C. § 586(a)(3)(G). ECF No. 65, ¶ 5.

### UpRight Law

6. At all times relevant to the Motion, the law firm that is the subject of the Motion was known as Law Solutions Chicago LLC ("LSC"). The law firm is now named Deighan Law LLC.

7. LSC is an Illinois limited liability company that, at all times relevant to the Motion, was authorized to do business in the State of Texas as Chern Law LLC. Dec. 6 Hrg., Chern, 157:20 – 158:6. The law firm is commonly known as UpRight Law, which is the name by which the firm does business in the majority of States. Dec. 6, 2018, Hrg., Chern, 157:20 – 158:6. The law firm currently does business in the State of Texas as Deighan Law LLC. For purposes of this Joint Stipulation of Disputed and Undisputed Facts (the "Joint Stipulation"), the law firm will be referred to as UpRight Law.

8. At the time of the hearings on the Motion, Kevin Chern owned 99 percent and David Leibowitz owned 1 percent of UpRight Law. Dec. 6, 2018, Hrg., Chern, 158:24 –159:3.

9. UpRight Law is a "debt relief agency" as defined in 11 U.S.C. § 101(12A). Dec. 6, 2018, Hrg., Chern, 158:7-20; ECF No. 65, ¶ 10. UpRight Law provides bankruptcy assistance and debt relief services. Dec. 6, 2018, Hrg., Chern, 158:7-10.

10. UpRight Law advertises its services over the internet by using the website www.uprightlaw.com. Dec. 6 Hrg, Chern, 158:12-14.

11. At the time of the hearings on the Motion, Upright Law had approximately 350 partners nationwide. Dec. 6 Hrg, Chern, 158:15-16.

12. In 2016, UpRight Law's gross sales and receipts were $18,831,376.[12]

13. In 2016, UpRight Law's net income (loss) was ($123,367).

14. In 2017, UpRight Law's gross sales and receipts were $23,393,439.

15. In 2017, UpRight Law's net income was $219,970.

16. In 2018, UpRight Law's gross sales and receipts were $28,683,556.

17. In 2018, UpRight Law's net income (loss) was ($673,346).

### UpRight Law's Firm Model

18. UpRight Law has a Partner Relations Department that determines if a prospective local partner's "behavior is consistent with . . . the 'UpRight Law way" in terms of the ways that [UpRight Law] consider[s] to be best practices in delivering services to clients." Dec. 6 Hrg., Chern, 162:22 – 164:10.

19. When the UpRight Law Partner Relations Department identifies a prospective partner, it reviews websites that contain attorney ratings from consumers and peers. Dec. 6 Hrg., Chern, 163:8 – 164:3.

20. UpRight Law's Vice President of Partner Relations primarily responsible for conducting recruitment and he will have multiple conversations with each prospective partner. Dec. 6 Hrg., Chern, 164:3-10, 165:2-9.

21. UpRight Law's Vice President of Partner Relations provides each prospective partner with a copy of a partnership agreement and a 40-page professional responsibility opinion prepared by Mary Robinson, former Administrator for the Illinois Attorney Registration and Disciplinary Commission. Dec. 6 Hrg., Chern, 164:12-25.

---

[12] The figures in Paragraphs 12–17 are based on the declaration of Ryan M. Galloway, UpRight Law's Associate General Counsel and Vice President of Legal Delivery, which was provided to the United States Trustee and Marina Dominguez on September 25, 2019.

22. After the attorney agrees to join the firm, Mr. Chern spends an hour on the phone with each new partner to inform him or her of the manner in which UpRight Law provides services and the level of performance expected of the prospective partner. Dec. 6 Hrg., Chern, 165:2 – 166:5.

23. Mr. Chern described this conversation with the new partner as a "best practices" or the "UpRight Law way" call, in which he speaks to the partner frankly and directly about the firm's expectations about the way the partner delivers legal services as a partner of UpRight Law. Dec. 6 Hrg., Chern, 165:18-22.

24. Mr. Chern also informs the new partner that he or she likely will be under a level of scrutiny to which the partner may not be accustomed, and that it is important that he or she adheres to the rules and procedures in the partner's local jurisdiction. Dec. 6 Hrg., Chern, 165:22– 166:1.

25. According to Mr. Chern, "It's an ongoing process of coaching and monitoring so it's not just 'you become a partner and you're done.' It's kind of an ongoing process where the staff works very closely with these partners over time." Dec. 6 Hrg., Chern, 166:1-5.

26. For the period in which UpRight Law represented Bianca Cruz, Mr. Chern was the managing partner of the firm. Dec. 6 Hrg., Galloway, 151:4-6.

27. Mr. Chern had ultimate oversight authority over all attorneys in the firm. Dec. 6 Hrg., Galloway, 151:7-11.

28. At the time of the December 6, 2018 hearing on the Motion, Mr. Chern remained the managing partner but the firm also established a management committee that votes on firm initiatives. Dec. 6 Hrg., Galloway, 151:12-17.

29. At the time of the December 6, 2018 hearing on the Motion, Mr. Chern was the managing partner of the firm and, in that role, implemented the initiatives voted upon by the management committee. Dec. 6 Hrg., Galloway, 151:12-19.

30. In 2018, UpRight Law retained an independent monitor. Dec. 6 Hrg., Galloway, 151:22 – 153:9.

31. When a client retains UpRight Law, a local partner is immediately assigned to the client's case. Dec. 6 Hrg., Dominguez, 41:17-18.

32. The attorney assigned to a matter has ultimate responsibility and ultimate decision- making authority for all aspects of the client's case, including whether or not to approve or decline the representation. Dec. 6 Hrg., Galloway, 122:4-9.

33. Ultimate responsibility for the preparation and filing of any documents in the client's case falls on the partner assigned to represent the client. Dec. 6 Hrg., Galloway, 127:22-24.

34. When a client pays his or her attorney's fee and filing fee in full, UpRight Law sends an email to the client congratulating the client on paying his or her fees, providing the local partner's contact information, and advising the client that he or she will need to start gathering documents. Dec. 6 Hrg., Dominguez, 70:16-25.

35. When a client pays his or her attorney's fee and filing fee in full, UpRight Law sends an email to the local partner advising that the client has paid his or her fees in full, providing the client's contact information and other information previously provided to the firm by the client, and advising the local partner to contact the client so that he or she can start gathering documents. Dec. 6 Hrg., Dominguez, 71:1-8.

36. The UpRight Law Partner Relations Department responds to questions from partners related to firm processes. Dec. 6 Hrg., Dominguez, 90:21 – 91:4.

37. UpRight Law has certain policies and procedures designed to prevent potential violations of ethical rules by its attorneys. However, Ryan Galloway, UpRight Law's Associate General Counsel and Vice President of Legal Delivery, testified that "a policy is only as good as the people who are enforcing it and the people who are following it." Dec. 6 Hrg., Galloway, 131:2-10. According to Mr. Galloway, "[N]o policy is ever 100 percent able to prevent any type of . . . misstep or mishap in an organization." Dec. 6 Hrg., Galloway, 131:9-10.

38. Mr. Galloway testified that UpRight Law has multiple supervising attorneys who are responsible for certain aspects of Ms. Dominguez's performance and her partnership. Dec. 6 Hrg., Galloway, 132-4-5. Mr. Galloway also testified that UpRight Law has a policy that local partners must obtain wet signatures in every case and another policy by which UpRight Law audits local "partners on periodic bases multiple times per year to ensure the partners are adhering to the policy of obtaining those wet signatures. Dec. 6 Hrg., Galloway, 132:17 – 133:10, 134:11-19.

39. Mr. Galloway testified that at the time of the December 6, 2018 hearing on the Motion, UpRight Law attorneys with supervising authority included, without limitation: (i) Kevin Chern, the firm's then-managing partner; (ii) Craig Sonnenschein, the firm's General Counsel; (iii) Ryan Galloway, the firm's Associate General Counsel and Vice President of Legal Delivery; (iv) David Menditto, the firm's Associate General Counsel for Litigation; and (v) Jocelyn Galloway, the firm's Corporate and Compliance Counsel. Dec. 6 Hrg., Galloway, 134:20 – 135:4.

40. UpRight Law sometimes provides specific guidance or criticism to partner attorneys. Dec. 6 Hrg., Galloway, 148:2-4.

41. If an UpRight Law partner has an issue with a client of the firm, the partner can go to the Partner Relations Department, which can either help the partner to address the issue or refer the issue to someone in the home office to assist the partner. Dec. 6 Hrg., Galloway, 133:11-22.

42. Mr. Galloway testified that UpRight Law "has regular all-company meetings and partner meetings and during those meetings, we often talk about best practices and the way partners should be going about handling certain situations that come up." Dec. 6 Hrg., Galloway, 148:15-18.

43. UpRight Law holds an annual, all-company, in-person meeting in which presenters review firm policies and procedures, conduct question and answer sessions, and provide Continuing Legal Education courses. Dec. 6 Hrg., Galloway, 148:15 – 149:20.

44. From time to time, UpRight Law's oversight efforts result in the termination of a partner. Dec. 6 Hrg., Galloway, 147:14-16.

### *UpRight Law's Practice Nationwide and in the State of Texas*

45. As of December 6, 2018, UpRight Law had filed approximately 34,000 bankruptcy cases nationwide. Dec. 6 Hrg., Galloway, 152:14-17.

46. As of December 6, 2018, the firm had filed approximately 926 bankruptcy cases in the State of Texas. Dec. 6 Hrg., Galloway, 152:18-19.

47. As of December 6, 2018, the firm had filed approximately 259 bankruptcy cases in the Southern District of Texas. Dec. 6 Hrg., Galloway, 152:20-24.

48. Mr. Galloway testified that as of December 6, 2018, no UpRight Law partner had been sanctioned in any bankruptcy case filed in the State of Texas, including but not limited to the Southern District of Texas. Dec. 6 Hrg., Galloway, 152:25 – 153:4.

49. As of December 6, 2018, UpRight Law had never been sanctioned in any bankruptcy case filed in the State of Texas, including but not limited to the Southern District of Texas. However, UpRight Law acknowledges that in *In re Bowles*, No. 16-34072 (Bankr. S.D. Tex.), the firm offered to disgorge the pre-petition fees paid by the debtor, which was reflected in an order proposed by UpRight Law.  UpRight Law later issued a refund check to the debtor in the amount of $1,550.

50. According to the Chapter 7 Trustee, Catherine Curtis (the "Chapter 7 Trustee" or "Ms. Curtis"), the United States Trustee advised her and other panel trustees via email to "keep an eye out" for UpRight Law cases. Nov. 2 Hrg., Curtis, 123:6-17, 127:3-8. She testified she did not "think that it meant to do anything at a heightened level" beyond her statutory duties. Nov. 2 Hrg., Curtis, 123:6-17, 126:15-127:8, 131:19-132:15, 133:1-22, 135:8-137:13.   Prior to such contact from the United States Trustee, Ms. Curtis had already had some "concerns about [UpRight Law] and its representation" and had already "brought those concerns to the attention of the United States Trustee's Office in Houston." Nov. 2 Hrg., Curtis, 137:4-7.

51. As of November 2, 2018, Ms. Curtis had worked on other cases filed by UpRight Law attorneys. Nov. 2 Hrg., Curtis, 125:25 – 126:3.

52. As of November 2, 2018, Ms. Curtis had not referred any other UpRight Law cases to the United States Trustee, except this case. Ms. Curtis referred this to the United States Trustee because of the issues Ms. Cruz had with UpRight Law and the amount of money she paid. Nov. 2 Hrg., Curtis, 141:24 – 142:12.

53. According to Ms. Curtis, the reason she had not referred any other UpRight Law cases to the United States Trustee is that there was no basis to do so. Nov. 2 Hrg., Curtis, 142:13-15.

### *Marina Dominguez*

54. Marina Dominguez ("Ms. Dominguez") is an attorney licensed to practice law in the State of Texas. Dec. 6 Hrg., Dominguez, 7:9-11. She has been practicing bankruptcy law since 1991 or 1992. Dec. 6 Hrg., 7:12-14.

55. At the time of the hearings on the Motion, Ms. Dominguez had been a partner at UpRight Law since early 2017. Dec. 6 Hrg., Dominguez, 10:12-13. She had never visited the Chicago office of UpRight Law and was a non-equity, non-voting partner at UpRight Law. Dec. 6 Hrg., Dominguez, 10:17 – 11:3.

56. On December 19, 2018, UpRight Law terminated its relationship with  Ms. Dominguez. Mar. 6 Hrg., Menditto, 32:11-19; Apr. 26 Hrg., Dominguez, 37:1-11; Menditto Ex.21.

57. As of December 6, 2018, approximately 40 percent of Ms. Dominguez's law practice was dedicated to consumer bankruptcy cases. Dec. 6 Hrg., Dominguez, 7:24 -8:2.

58. From 2016 to 2018, Ms. Dominguez filed about seventeen (17) bankruptcy cases, four (4) or five (5) of which were filed on behalf of UpRight Law clients. Dec. 6 Hrg., Dominguez, 8:3-8.

59. The majority of the bankruptcy cases filed by Ms. Dominguez on behalf of UpRight Law clients were Chapter 7 bankruptcy cases. Dec. 6 Hrg., Dominguez, 8:9-11.

60. Ms. Dominguez is a "debt relief agency" as defined in 11 U.S.C. § 101(12A). Dec. 6 Hrg., Chern, 158:17-20; ECF No. 65, ¶ 10.

61. Prior to the filing of the Motion, Ms. Dominguez had never been: (a) the subject of a motion for sanctions; (b) sanctioned by a court; nor (c) disciplined by a bar association or a court. Dec. 6 Hrg., Dominguez, 107:2-8.

62. As of November 2, 2018, Ms. Curtis had worked on approximately five bankruptcy cases filed by Ms. Dominguez. Nov. 2 Hrg., Curtis, 124:24 – 125:10.

63. As of November 2, 2018, Ms. Curtis had had no issues with Ms. Dominguez, and had not referred Ms. Dominguez to the United States Trustee, in any other cases. Nov. 2 Hrg., Curtis, 125:15-17, 142:16-19.

64. As of November 2, 2018, Ms. Curtis had never seen any issues with Ms. Dominguez's filings in other bankruptcy cases filed on behalf of UpRight Law clients. Nov. 2 Hrg., Curtis, 139:5-8.

65. According to Ms. Curtis, if she had had any issues with Ms. Dominguez in the other cases, she would have informed counsel for the United States Trustee. Nov. 2 Hrg., Curtis, 125:15-20.

### Bianca Cruz

### General Information

66. Bianca Cruz ("Ms. Cruz") is an "assisted person" as defined in 11 U.S.C. § 101(3) because her debts consist primarily of consumer debts and the value of her non-exempt property is less than $192,450.  Dec. 6 Hrg., Chern, 158:21-23; ECF No. 65, ¶ 11.

67. Ms. Cruz resides at 16917 Borchardt Avenue, Harlingen, Texas.   Nov. 2 Hrg., Cruz, 7:6-9.  The real property is owned by her mother. Nov. 2 Hrg., Cruz, 7:10-11.

68. Ms. Cruz is divorced and has no dependents.  Nov. 2 Hrg., Cruz, 7:12-15.

69. At the time of the hearings on the Motion, Ms. Cruz was unemployed.   Nov. 2 Hrg., Cruz, 7:16-17.

70. Ms. Cruz has been disabled since 1997. Nov. 2 Hrg., Cruz, 7-16-19.  She became disabled because of her knee. Nov. 2 Hrg., Cruz, 7:20-25.  She has had arthroscopic knee surgery for a torn ACL and knee replacement surgery.  Nov. 2 Hrg., Cruz, 8:1-7.

71. Ms. Cruz suffers from unstable angina, Stage 1 kidney failure, liver disease, asthma, COPD, diabetes, and sleep apnea. Nov. 2 Hrg., Cruz, 8:21 – 9:9.

72. At the time of the hearings on the Motion, Ms. Cruz's sources of income included Social Security disability benefits, including Social Security Disability Insurance and Supplemental Security Income, and back child support payments.   Nov. 2 Hrg., Cruz, 8:12-20 and 9:13-15.

### Ms. Cruz's 2006 Bankruptcy Case

73. In 2006, Ms.  Cruz filed a chapter 13 bankruptcy case in this district and later received a chapter 13 discharge.   Nov. 2 Hrg., Cruz, 9:23-10:5.

74. Prior to filing her Chapter 13 bankruptcy petition in 2006, Ms. Cruz reviewed the petition with her attorney. Nov. 2 Hrg., Cruz, 77:15-20.

75. Ms. Cruz is generally familiar with what should occur in a bankruptcy case.  Nov. 2 Hrg., Cruz, 10:6-8.

76. Based on her experience in filing a chapter 13 bankruptcy case in 2006, Ms. Cruz understood that once a bankruptcy petition is filed, a date for the meeting of creditors would be scheduled.  Nov. 2 Hrg., Cruz, 82:9 – 83:5.

### *UpRight Law's Representation of Ms. Cruz*

77. In May or June of 2016, Ms. Cruz began having financial difficulty because of a monthly reduction of about $175 in Social Security disability benefits.  Nov. 2 Hrg., Cruz, 11:20 – 12:4.

78. In May or June of 2016, Ms. Cruz learned of UpRight Law either through the Internet or an advertisement in her doctor's office. Nov. 2 Hrg., Cruz, 10:13-19, 11:15-16.

79. UpRight Law appealed to Ms. Cruz because she does not like driving and she would be able to communicate via Skype.  Nov. 2 Hrg., Cruz, 10:20 – 11:2.

80. In June of 2016, Ms. Cruz telephoned UpRight Law at the number listed in the advertisement she saw.  Nov. 2 Hrg., Cruz, 12:11-13; 12:25 – 13:1.  Ms. Cruz believed the agents of UpRight Law with whom she spoke were attorneys.  Nov. 2 Hrg., Cruz, 13:4-20.

81. Ms. Cruz provided information about her income, debts, address, Social Security disability benefits, driver's license number, date of birth, and bankruptcy filing history. Nov. 2 Hrg., Cruz, 13:15-23.

82. UpRight Law's non-attorney agent told Ms. Cruz "[t]hey had to see if [Ms. Cruz] qualified for Chapter 7 or which Chapter [she] qualified for and based on [Ms. Cruz's] income if [she] qualified for bankruptcy."   Nov. 2 Hrg., Cruz, 13:7-9; Dec. 6 Hrg., Galloway, 139:1-25. UpRight Law's non-attorney agent quoted Ms. Cruz a flat fee for representation in a chapter 7 case.  Dec. 6 Hrg., Galloway, 119:17-120:5; UST Ex. 3.

83. Ms. Cruz communicated with UpRight Law via telephone and emails.   Nov. 2 Hrg., Cruz, 12:14-24.

84. Whenever Ms. Cruz called the toll-free number for UpRight Law, she was always able to get somebody. Nov. 2 Hrg., Cruz, 92:12-14.

85. Ms. Cruz had multiple telephone conversations with different UpRight Law representatives. Nov. 2 Hrg., Cruz, 13:10-11.

86. On June 21, 2016, UpRight Law sent Ms. Cruz an email setting forth certain information gathered from Ms. Cruz and asking her to confirm the accuracy of the information. Nov. 2 Hrg., Cruz, 14:4-25; UST Ex. 3 at 00025-00026.

87. Ms. Cruz agreed to pay UpRight Law fees totaling $3,135. Nov. 2 Hrg., Cruz, 15:1-10; UST Ex. 3, 00026. This amount consisted of an attorney's fee in the amount of $2,800 and a filing fee in the amount of $335. Nov. 2 Hrg., Cruz, 15:1-10; UST Ex. 3 at 00026.

88. Ms. Cruz was advised and understood that her bankruptcy petition would not be filed until the fees were paid in full. Nov. 2 Hrg., Cruz, 15:1-10; 18:14-23.

89. On June 23, 2016, Ms. Cruz electronically signed the Attorney Client Base Representation Agreement for Chapter 7 Bankruptcy Related Services ("Engagement Agreement") with UpRight Law. Nov. 2 Hrg., Cruz, 16:20-24; UST Ex. 1 at 00011.    The Engagement Agreement bears the electronic endorsement of Jon Chatmon for "Allen Chern Law LLC," UST Ex. 1 at 00011, but Ms. Cruz never spoke to Mr. Chatmon. Nov. 2 Hrg., 16:12-17:23; Dec. 6 Hrg., Galloway, 121:6-11.

90. The Engagement Agreement provided that UpRight Law would represent Ms. Cruz in a Chapter 7 bankruptcy case. UST Ex. 1 at 00011. Under the Engagement Agreement, UpRight Law agreed to render, among other services, the following services to Ms. Cruz:

(b) when applicable, fil[e] the debtor's payment advices together with the Payment Advice Form or cover sheet;

(e) assist[] the Client in complying with all of the requirements imposed by the Bankruptcy Laws and Rules;

(f) prepar[e] and fil[e] the petition, all required lists, schedules, and statements, as well as any amendments that may be necessary or appropriate;

(k) assist[] Client in complying with information requests by the Bankruptcy Trustee, the Court, or other parties; [and]

(m) reviewing of Bankruptcy Petition and Schedules[.]

UST Ex. 1 at 00008-00009.

91. The Engagement Agreement purported to exclude representation of Ms. Cruz in any discharge objection, debtor audit, adversary proceeding, or contested matter. ECF No. 65, ¶ 16; Nov. 2 Hrg., Cruz, 20:17 – 21:12; UST Ex. 1 at 00008-00009.

92. The Engagement Agreement also provided:

If [Ms. Cruz] terminate[s] [UpRight Law] at any time before the conclusion of this representation, [UpRight Law] will have earned fees in this matter.    [Ms. Cruz] agrees

that [she] owes fees for any pre-termination services and that the value of the services will be computed based on the lawyer and paraprofessional time that has been expended at [UpRight Law's] normal hourly rates.  In conjunction with termination, [Ms. Cruz] may request an accounting of services provided and a refund of any unearned portion of the fee.

UST Ex. 1, ¶ 2, at 00006.

93. UpRight Law permitted Ms. Cruz to pay her fees in monthly installments pursuant to a payment plan. Nov. 2 Hrg., Cruz, 70:9-11.

94. Ms. Cruz was not required to pay any amount when she retained UpRight Law, but at that time she was required to authorize UpRight Law to electronically draft her account starting in July of 2016. Nov. 2 Hrg., Cruz, 21:13-22:11; 70:12-13; UST Ex. 1 at p. 00012

95. Ms. Cruz was able to afford the monthly payments under her plan. Nov. 2 Hrg., Cruz, 70:14-16.

96. If UpRight Law had asked Ms. Cruz to pay her entire fee up front, or within one or two months, she would not have been able to do so. Nov. 2 Hrg., Cruz, 70:23 – 71:1.

97. Ms. Cruz considered the ability to pay her fee over time to be a benefit of retaining UpRight Law. Nov. 2 Hrg., Cruz, 71:2-4.

98. Ms. Cruz executed an Automatic Payment Program Application and Authorization for Withdrawals, which authorized direct withdrawals from Ms. Cruz's checking account of the scheduled monthly payments of fees. ECF No. 65, ¶ 18; Nov. 2 Hrg., Cruz, 21:13 – 19; UST Ex. 1 at 00012-00013.

99. Ms. Cruz paid her first installment under the payment plan in July of 2016. Nov. 2 Hrg., Cruz, 70:9-13.

100. Ms. Cruz made monthly payments totaling $3,135 to UpRight Law from July of 2016 through July of 2017. Nov. 2 Hrg., Cruz, 21:23 – 22:11; UST Ex. 4.

101. A disputed fact exists as to whether Ms. Cruz spoke with a Texas partner of UpRight Law around the time she retained the firm. See Section III.A, infra.

102. The initial call between an UpRight Law local partner and a client that has just hired the firm is referred to as a "welcome call." Dec. 6 Hrg., Dominguez, 67:24-25.

103. When Ms. Dominguez conducts a "welcome call," she introduces herself, provides her contact information to the client, verifies information the client provided during intake, and evaluates which bankruptcy chapter is appropriate for the client. Dec. 6 Hrg., Dominguez, 67:24 – 68:16.

104. In March 2017, Ms. Dominguez was assigned to represent Ms. Cruz. Dec. 6 Hrg., Dominguez, 34:16-18; Dec. 6 Hrg., Galloway, 120:9-14.

105. The reason UpRight Law assigned Ms. Dominguez to represent Ms. Cruz was that Ms. Dominguez is located near where Ms. Cruz resides. Dec. 6 Hrg., Dominguez, 11:12-17; Dec. 6 Hrg., Galloway, 121:19-21.

106. Under Ms. Dominguez's partnership agreement with UpRight Law, she was able to decline the representation of Ms. Cruz if she so chose. Dec. 6 Hrg., Dominguez, 11:18-20; Dec. 6 Hrg., Galloway, 121:25 – 122:9.

107. Ms. Dominguez did not speak with Ms. Cruz at the time she was assigned to represent her because Ms. Cruz was still making payments under her payment plan. Dec. 6 Hrg., Dominguez, 69:14-22.

108. Ms. Cruz was permitted to contact Ms. Dominguez at any time while Ms. Dominguez was assigned to represent her, including while she was still making payments under her payment plan. Dec. 6 Hrg., Dominguez, 69:23 – 70:13.

109. In March of 2017, Ms. Cruz had surgery. Nov. 2 Hrg., Cruz, 96:11-15.

110. Ms. Dominguez has never met the individuals at UpRight Law responsible for performing the "intake" and does not know whether all of them are attorneys. Dec. 6 Hrg., Dominguez, 12:15-23. Ms. Dominguez communicates with the intake staff via email and sometimes by telephone. Dec. 6 Hrg., Dominguez, 12:20-25.

111. Ms. Dominguez was not involved with (i) the preparation and execution of the Engagement Agreement, (ii) the determination of the fees that Ms. Cruz would be required to pay UpRight Law, or (iii) the collecting and processing of Ms. Cruz's payments. Dec. 6 Hrg., Dominguez, 13:10 – 14:2.

112. Ms. Dominguez does not know where the monies paid by Ms. Cruz were deposited or where the UpRight Law bank account is located. Dec. 6 Hrg., Dominguez, 14:3-6.

113. Ms. Cruz and Ms. Dominguez agree that they spoke at some point after Ms. Cruz paid her fees in full. However, a dispute of fact exists as to when Ms. Cruz and Ms. Dominguez first spoke with one another. See Section III.B, infra.

114. Based upon communications with UpRight Law representatives, Ms. Cruz understood that Ms. Dominguez was an attorney with UpRight Law that had been assigned represent her. Nov. 2 Hrg., Cruz, 92:15-24.

115. Ms. Cruz underwent an outpatient cardio angiogram procedure in July or August of 2017. Nov. 2 Hrg., Cruz, 97:9-18.

116. Ms. Cruz understood that one of her obligations under the Engagement Agreement was to obtain a pre-filing consumer credit counseling course.  Nov. 2 Hrg., Cruz, 19:5-12; UST Ex. 1, ¶ 7(a), at 00008.

117. On August 3, 2017, Ms. Cruz took a credit counseling course with MoneySharp Credit Counseling.  Nov. 2 Hrg., Cruz, 19:11-21; 49:20 – 50:7; 50:18-22; UST Ex. 26.

118. In September 2017, Ms. Cruz contacted UpRight Law for the purpose of getting in touch with the partner assigned to represent her. Nov. 2 Hrg., Cruz, 72:12-14.

119. A disputed fact exists as to whether Ms. Cruz and Ms. Dominguez spoke in the September 2017 timeframe. See Section III.B, infra.

120. In November of 2017, Ms. Cruz telephoned UpRight Law and was informed that the firm had been trying to get in touch with her and that her file was in a suspended status. Nov. 2 Hrg., Cruz, 24:19-24, 73:11:16, 74:11-14, 95:11-16.  Ms. Cruz was told that she needed to pay $25 to reinstate her bankruptcy file because she had failed to respond to efforts by UpRight Law to reach her.   Nov. 2 Hrg., Cruz, 74:7-14.   Ms. Cruz disputed the allegations but paid the $25 because she wanted to continue with UpRight Law and had already paid over $3,000.   Nov. 2 Hrg., Cruz, 24:25 – 26:7.

121. On December 4, 2017, Ms. Cruz made an additional payment of $25 to UpRight Law. Nov. 2 Hrg., Cruz, 24:25 – 26:7.  In all, Ms. Cruz paid a total of $3,160 to UpRight Law. Nov. 2 Hrg., Cruz, 27-7-9; UST Ex. 2.

122. A disputed fact exists as to whether: (i) following Bianca Cruz's payment of $25, a new retention agreement was issued to reflect that additional amount paid; (ii) Ms. Cruz executed the new retention agreement; and (iii) Ms. Dominguez's signature was affixed to the new retention agreement on behalf of UpRight Law. See Section III.B, infra.

123. In December of 2017, Ms. Cruz met with Ms. Dominguez in person for the first time. Nov. 2 Hrg., Cruz, 28:5-13, 75:15-16; Dec. 6 Hrg., Dominguez, 43:4-23.

124. During the December 2017 meeting, Ms. Cruz provided documents and information to Ms. Dominguez, and Ms. Dominguez filled out a 27-page Client Questionnaire for Non-Business Debtor. Nov. 2 Hrg., Cruz, 28:14-16, 29:14-18, 75:17-18, 77:1-7; Dec. 6 Hrg., Dominguez, 17:7-11

125. Ms. Cruz completed worksheets regarding her assets and liabilities.  Nov. 2 Hrg., Cruz, 28:14-16, 29:21-23.  Ms. Cruz also provided Ms. Dominguez with documents, including her identification, bank statements, letters from creditors, and documents regarding her vehicle. Nov. 2 Hrg., Cruz, 29:14-18.

126. During the December 2017 meeting, Ms. Dominguez asked Ms. Cruz to provide additional documents. Nov. 2 Hrg., Cruz, 76:4-9; Dec. 6 Hrg., Dominguez, 17:12-15.

127. The missing documents were in the nature of "current bank statements, not the ones that [Ms. Cruz] had already given because the time had already passed," and perhaps credit card statements. Nov. 2 Hrg., Cruz, 76:4-9; Dec. 6 Hrg., Dominguez, 17:16-18.

128. Ms. Cruz did not remember reviewing a bankruptcy petition with Ms. Dominguez during the December 2017 meeting. Nov. 2 Hrg., Cruz, 76:15-17.

129. In February of 2018, Ms. Cruz met with Ms. Dominguez in person for the second time. Nov. 2 Hrg., Cruz, 33:10-12, 31:21-24; Dec. 6 Hrg., Dominguez, 16:23 – 17:3.

130. During the February 2018 meeting, Ms. Cruz provided Ms. Dominguez with documents that Ms. Dominguez had requested during their December 2017 meeting. Nov. 2 Hrg., Cruz, 33:13-20; Dec. 6 Hrg., Dominguez, 17:19-21.

131. Ms. Dominguez testified that during the February 2018 meeting, Ms. Dominguez and Ms. Cruz discussed Ms. Cruz's income and reviewed some schedules that Ms. Dominguez had prepared based on information previously provided by Ms. Cruz. Dec. 6 Hrg., Dominguez, 35:5-9, 77:10-13.

132. During the February 2018 meeting, Ms. Cruz understood that her bankruptcy case had not yet been filed.  Nov. 2 Hrg., Cruz, 83:8-15.  Ms. Dominguez told Ms. Cruz that after the bankruptcy case was filed, Ms. Cruz would receive notice of the date for the meeting of creditors. Nov. 2 Hrg., Cruz, 83:8-17. A disputed fact exists as to whether Ms. Dominguez told Ms. Cruz that she could not get a court date at that time because "the young lady [who set hearing dates] was out sick still so . . . she could not get a court date yet." See Sections III.F and III.G, infra.

133. Bianca Cruz did not remember signing any documents during the February 2018 meeting. Nov. 2 Hrg., Cruz, 33:23-24.

134. A disputed fact exists as to whether, at the end of the February 2018 meeting, and in subsequent conversations, Ms. Dominguez advised Ms. Cruz that she still needed to provide additional documents.  See Section III.C, infra.

135. On February 26, 2018, Ms. Cruz took her second pre-filing consumer credit counseling course, this time from CC Advising Inc. Nov. 2 Hrg., Cruz, 19:22-23, 52:3-12; UST Ex. 9, 00069.

136. From the time she first met Ms. Cruz in December 2017 through May 2018, Ms. Dominguez did not receive any communications from UpRight Law's home office indicating that Ms. Cruz had been calling to complain about Ms. Dominguez. Dec. 6 Hrg., Dominguez, 80:20 – 81:8.

137. In May 2018, Bianca Cruz was served with papers notifying her that a collection lawsuit had been initiated against her based on credit card debt she owed. Nov. 2 Hrg., Cruz, 35:20-24, 36:4-10; Dec. 6 Hrg., Dominguez, 81:11-13.

138. A disputed fact exists whether Ms. Cruz faxed a copy of the collection lawsuit to Ms. Dominguez and whether Ms. Dominguez received it.  See Section III.D, infra.

139. Ms. Dominguez and Ms. Cruz discussed the collection lawsuit in May of 2018. Nov. 2 Hrg., Cruz, 36:4-10; Dec. 6 Hrg., Dominguez, 27:23 – 28:7; 81:11-13.

140. Ms.  Cruz testified that Ms. Dominguez said that everything was going to be handled in the bankruptcy and not to worry about the lawsuit.  Nov.2 Hrg., Cruz, 36:4-10.

141. Ms.  Dominguez testified that after Ms.  Cruz was served with the collection lawsuit, Ms. Cruz was more motivated to proceed with getting her bankruptcy petition filed. Dec. 6 Hrg., Dominguez, 21:24 – 22:4, 81:11-16.

142. A disputed fact exists as to whether Marina Dominguez and Bianca Cruz met in person in June 2018. See Section III.E, infra.

143. A disputed fact exists as to whether Respondents' Exhibit 11 contains Ms. Cruz's actual wet signature and represents a true and accurate copy of an original bankruptcy petition. See Section III.E, infra.

144. Undisputed facts regarding Respondents' Exhibit 11 include:

   a.   Respondents' Exhibit 11 at page 000008 contains a true and accurate copy of Ms. Dominguez's wet signature. Dec. 6 Hrg., Dominguez, 50:12-13.

   b.   Ms. Dominguez testified that she actually signed the bankruptcy petition on July 19 or July 20, 2018. Dec. 6 Hrg., Dominguez,51:1-8.

   c.   Ms.  Dominguez wrote the date of July 18, 2018 under her signature in Respondents' Exhibit 11 at page 000008. Dec. 6 Hrg., Dominguez, 50:24- 25.

   d.   Ms. Dominguez wrote the date of July 18, 2018 under Ms. Cruz's alleged signature in Respondents' Exhibit 11 at page 000007.  Dec.  6 Hrg., Dominguez, 52:17-21.

   e.   Ms. Dominguez did not provide a copy of Respondents' Exhibit 11 to Ms. Cruz. Dec. 6 Hrg., Dominguez, 22:18-20.

145. Ms. Cruz and Ms. Dominguez agree that between December 2017 and June 2018, they had multiple telephone conversations with one another. Nov. 2 Hrg., Cruz, 32:10 – 36:17; Dec. 6 Hrg., Dominguez, 25:8 – 29:4.

146. Disputed facts exist as to what was communicated during those conversations. See Section III.F, infra.

147. In July of 2018, Ms. Cruz telephoned Ms. Dominguez but was told that the number was no longer in service.  Nov. 2 Hrg., Cruz, 37:13-24; Dec. 6 Hrg., Dominguez, 29:5-20.

148. Ms. Cruz later telephoned UpRight Law and was told that the firm would contact Ms. Dominguez on her personal phone.    Nov. 2 Hrg., Cruz, 37:25 – 38:15; Dec. 6 Hrg., Dominguez, 29:21-23.    UpRight Law then contacted Ms. Dominguez. Dec. 6 Hrg., Dominguez, 29:24-25. Subsequently, Ms. Dominguez telephoned Ms. Cruz.    Nov. 2 Hrg., Cruz, 38:7-15; Dec. 6 Hrg., Dominguez, 30:1-2.

149. Mr. Chern testified that firm records indicated that prior to July 2018, Ms. Cruz had contacted the firm on several occasions when she wanted to speak with Ms. Dominguez. Dec. 6 Hrg., Chern, 188:10-18.  Mr. Chern testified that firm records also indicated that on such occasions UpRight Law would get in touch with Ms. Dominguez, and she would connect with Ms. Cruz shortly thereafter. Dec. 6 Hrg., Chern, 188:13-21.

150. Mr. Chern testified that firm records did not indicate any calls from Ms. Cruz prior to July 2018, complaining about a lack of communication from Ms. Dominguez. Dec. 6 Hrg., Chern, 188:2-5.

151. Mr. Chern testified that firm records did not indicate any calls from Ms. Cruz prior to July 2018, complaining that her bankruptcy case had not been filed by Ms. Dominguez. Dec. 6 Hrg., Chern, 188:6-9.

152. Mr. Chern testified that he did not recollect any record of Ms. Cruz calling the home office to ask why her bankruptcy case had not been filed nor to express dissatisfaction with the excuses she was apparently receiving from Ms. Dominguez.  Dec. 6 Hrg., Chern, 189:10-24.

153. On July 16, 2018, Ms. Cruz contacted Attorney Leigh Ann Tognetti of the Oliva Law Firm for assistance in determining whether Ms. Cruz's bankruptcy petition had been filed. Nov. 2 Hrg., Cruz, 40:17 – 41:16.

154. Ms. Tognetti advised Ms. Cruz that her bankruptcy petition had not yet been filed. Nov. 2 Hrg., Cruz, 41:17-23.

155. Ms. Tognetti provided Ms. Cruz with a telephone number for Jeannie Chavez, a case manager with the bankruptcy court, to verify the information.  Nov. 2 Hrg., Cruz, 41:17 – 42:9.

156. Ms. Cruz telephoned Ms. Chavez, who verified that a bankruptcy case had not been filed for her. Nov. Hrg., Cruz, 41:23 – 42:9.

157. Based upon what Ms. Chavez had told Ms. Cruz, Ms. Cruz concluded that Ms. Dominguez had been lying to her and had been giving her the runaround.   Nov. 2 Hrg., Cruz, 42:25 – 43:8.

158. Ms. Cruz testified that when she learned her case had not been filed, she became stressed and ill.   Nov. 2 Hrg., Cruz, 43:9-12.   Ms. Cruz also testified that she had trouble breathing and talking, and had chest pains.   Nov. 2 Hrg., Cruz, 43:13-17.   Ms. Cruz later went to see a doctor regarding these symptoms.  Nov. 2 Hrg., Cruz, 43:22-25.

159. On July 16, 2018, Ms.  Cruz called UpRight Law regarding the fact that her bankruptcy petition had not been filed. Nov. 2 Hrg., Cruz, 55:11-15.   Ms. Cruz requested the case number for her bankruptcy case. Nov. 2 Hrg., Cruz, 44:1-8.

160. UpRight Law told Ms. Cruz that the firm had not received information from Ms. Dominguez indicating that her bankruptcy case had been filed.  Nov. 2 Hrg., Cruz, 44:1-8.

161. At the December 6, 2018 hearing on the Motion, Ms. Dominguez testified that she did not have reason to question Ms. Cruz's genuine confusion at that time.  Dec. 6 Hrg., Dominguez, 86:23 – 87:7.

162. UpRight Law informed Ms. Dominguez that Ms. Cruz had been unable to reach her. Dec. 6 Hrg., Dominguez, 29:15 – 30:2.

163. Mr. Chern testified that in July 2018, when Ms. Cruz spoke with the UpRight Law home office, the UpRight Law staff (i) investigated whether Ms. Cruz's bankruptcy petition had been filed, (ii) informed Ms. Cruz that the petition had not been filed, (iii) reached out to Ms. Dominguez to notify her of Ms. Cruz's complaints, (iv) followed up with Ms. Cruz to make sure she had been able to speak with Ms. Dominguez, (v) followed up with Ms. Dominguez to make sure she was communicating with Ms. Cruz, (vi) verified that Ms. Cruz's bankruptcy petition had been filed, and (vii) investigated what was left to be filed in Ms. Cruz's case. Dec. 6 Hrg., Chern, 190:4 – 191:3.

164. On July 18, 2018, Ms.  Dominguez electronically filed a Chapter 7 bankruptcy petition on behalf of Ms. Cruz in the United States Bankruptcy Court for the Southern District of Texas, Brownsville Division. ECF No. 1; UST Ex. 5; Dec. 6 Hrg., Dominguez, 30:4-12.

165. Ms. Cruz's bankruptcy case was assigned case number 18-10208. ECF No. 1; UST Ex. 5.

166. Ms.  Dominguez had not asked Ms. Cruz for permission to file her bankruptcy petition. Dec. 6 Hrg., Dominguez, 113:3-7.

167. Ms. Dominguez did not provide a copy of the filed bankruptcy petition to Ms. Cruz. Nov. 2 Hrg., Cruz, 48:22 – 49:4.

168. Disputed facts exist as to the reasons why Ms. Cruz's bankruptcy case was not filed until July 18, 2018. See Section III.G, infra.

169. Ms. Dominguez acknowledges that the July 18, 2018 date in Ms. Cruz's filed bankruptcy petition was not the date on which she claims Ms. Cruz signed the original bankruptcy petition. Dec. 6 Hrg., Dominguez, 53:19 – 54:3.

170. Ms. Dominguez acknowledges that the July 18, 2018 date in Ms. Cruz's filed bankruptcy petition, was intended to give the impression that Ms. Cruz had signed an original bankruptcy petition on that date. Dec. 6 Hrg., Dominguez, 53:1-24.

171. Ms. Dominguez did not file any bankruptcy schedules or statements, or a Disclosure of Compensation of Attorney for Debtor, on behalf of Ms. Cruz at the time the Chapter 7 bankruptcy petition was filed.  Dec. 6 Hrg., Dominguez, 54:4-10, 61:1-3, UST Ex. 25.

172. According to Ms. Dominguez, the reason she did not file any bankruptcy schedules or statements, or a Disclosure of Compensation of Attorney for Debtor, on behalf of Ms. Cruz at the time the Chapter 7 bankruptcy petition was filed was that she needed additional documents from Ms. Cruz. Dec. 6 Hrg., Dominguez, 54:4-10, 96:25 – 97:7.

173. Ms. Dominguez testified that the reason she filed the skeleton petition despite needing more documents was that Ms. Cruz was adamant about getting a case number and Ms. Dominguez "wanted to try and calm [Ms. Cruz] down.". Dec. 6 Hrg., Dominguez, 54:11-18.

174. Catherine Curtis, the Chapter 7 Trustee, testified that the Bankruptcy Code and Bankruptcy Rules permit a petition to be filed without the schedules or a Disclosure of Compensation of Attorney for Debtor. Nov. 2 Hrg., Curtis, 122:3-9.

175. Ms. Dominguez testified that from March to May of 2018 she had severe bronchial problems that required her to be under a doctor's care and medication.  Dec. 6 Hrg., Dominguez, 44:22 – 46:14.  Her health problems did not prevent her from fulfilling her obligations under the Engagement Agreement.  Dec. 6 Hrg., Dominguez, 47:4-10.  Ms. Dominguez also had some family issues but that did not prevent her from doing what she needed to do.  Dec. 6 Hrg., Dominguez, 47:22-24.

176. Ms. Dominguez did not inform the UpRight Law home office of her health or family issues. Dec. 6 Hrg., Dominguez, 48:14-16; Dec. 6 Hrg., Galloway, 122:20 – 123:5.

177. On July 19, 2018, the Court issued an Order: Possible Future Dismissal of Case, which identified various documents that had not yet been filed and needed to be filed within 14 days after the petition date (i.e., August 1, 2018). ECF No. 3.

178. On July 19, 2018, the Clerk of Court filed a Clerk's Notice, which indicated that "[n]o proof of attendance at an approved credit counseling course has been filed in this case." ECF No. 4.

179. On July 19, 2018, the Court issued an Initial Order for Prosecution of Chapter 7 Case. ECF No. 5.

180. Ms. Curtis received copies of Ms. Cruz's Chapter 7 bankruptcy petition and the July 19, 2018 orders and notices. Nov. 2 Hrg., Curtis, 122:10-18.

181. Ms. Dominguez did not discuss the July 19, 2018 orders and notices with Ms. Cruz. Dec. 6 Hrg., Dominguez, 55:21-22, 57:6-8.

182. Ms. Dominguez did not discuss the July 19, 2018 orders and notices with anyone at UpRight Law. Dec. 6 Hrg., Dominguez, 55:23-24, 57:9-10; UST Ex. 6-8.

183. Ms. Curtis did not notify Ms. Dominguez that there were any issues with regard to the Chapter 7 bankruptcy petition or the July 19, 2018 orders and notices. Nov. 2 Hrg., Curtis, 122:19-21; UST Ex. 5-8.

184. Ms. Curtis did not immediately notify counsel for the United States Trustee that there were any issues with regard to the Chapter 7 bankruptcy petition or the July 19, 2018 orders and notices. Nov. 2 Hrg., Curtis, 122:22-24; UST Ex. 5-8.

185. On July 21, 2018, copies of the July 19, 2018 orders and notices were mailed by the Bankruptcy Noticing Center to Ms. Cruz. Nov. 2 Hrg., Cruz, 49:8-12, 52:19-24; UST Ex. 6- 8.

186. Ms. Cruz received the Clerk's Notice about the lack of proof of attendance at an approved credit counseling course.  Nov. 2 Hrg., Cruz, 50:23 – 51: 24; UST Ex. 6.

187. Ms. Cruz called the Clerk of Court, who advised her that she had fourteen days from the date of her petition to file the missing documents identified in the July 19, 2018 orders and notices, otherwise the case would be dismissed. Nov. 2 Hrg., Cruz, 49:12-15, 53:1-24.

188. Ms. Dominguez did not talk to Ms. Cruz or anyone at UpRight Law about the Clerk's Notice regarding the lack of proof of attendance at an approved credit counseling course. Dec. 6 Hrg., Dominguez, 55:21 – 56:15.

189. Ms. Cruz received the Order of Possible Future Dismissal of Case. Nov. 2 Hrg., Cruz, 52:13-24; UST Ex. 8.  After talking to Ms. Chavez a second time, Ms. Cruz understood that her bankruptcy case would be dismissed if certain bankruptcy documents and information required under the Bankruptcy Code were not filed within fourteen (14) days. Nov. 2 Hrg., Cruz, 52:25 – 54:3.

190. Ms. Dominguez did not talk to Ms. Cruz or anyone at UpRight Law about the Order of Possible Future Dismissal of Case.   Dec. 6 Hrg., Dominguez, 56:16 – 57:10.  Ms. Dominguez wishes she had handled this differently. Dec. 6 Hrg., Dominguez, 57:3-8.

191. During the November 2, 2018 hearing on the Motion, the United States Trustee introduced UST Exhibit 27, which Ms. Cruz testified represented a true and accurate

copy of a July 23, 2018 fax that she had sent to Ms. Dominguez. Nov. 2 Hrg., Cruz, 56:3-12; UST Ex. 27.

192. In UST Exhibit 27, Ms. Cruz requested information from Ms. Dominguez regarding the court date and time and an explanation for the excessive amount of time it was taking to get a court date. Nov. 2 Hrg., Cruz, 56:3-12; UST Ex. 27. In UST Exhibit 27, Ms. Cruz asked for a response by July 26, 2018. Nov. 2 Hrg., Cruz, 56:13-16; UST Ex. 27.

193. Ms. Dominguez testified that she does not remember receiving or seeing the fax from Ms. Cruz but acknowledged that she may have seen it once. Dec. 6 Hrg., Dominguez 58:2- 5, 88:16-18; UST Ex. 27. Ms. Dominguez admitted that UST Exhibit 27 accurately reflects her fax number, that UST Exhibit 27 indicates that the fax was sent to her fax number on July 23, 2018, at about 11:40 a.m., and that the result identified in UST Exhibit 27 is "OK." Dec. 6 Hrg., Dominguez, 57:15 – 58:1, 88:1-15; UST Ex. 27. Ms. Dominguez does not dispute the accuracy of the confirmation sheet. Dec. 6 Hrg., Dominguez, 88:13- 15.

194. On July 26, 2018, Ms. Dominguez filed a Certificate of Credit Counseling on behalf of Ms. Cruz. Dec. 6 Hrg., Dominguez, 56:7-15; UST Ex. 9; ECF No. 11.

195. On or about July 29, 2018, Ms. Curtis communicated with Ms. Cruz about issues regarding her bankruptcy case. Nov. 2 Hrg., Curtis, 124:8-23.

196. Ms. Curtis did not inform Ms. Dominguez of the issues Ms. Cruz discussed with Ms. Curtis. Nov. 2 Hrg., Curtis, 124:8-11.

197. Ms. Curtis informed counsel for the United States Trustee of the issues Ms. Cruz had discussed with her. Nov. 2 Hrg., Curtis, 124:8-13.

198. Ms. Cruz communicated by text or phone with Ms. Curtis. Nov. 2 Hrg., Cruz, 57:9-19.

199. Ms. Curtis checked the docket in Ms. Cruz's bankruptcy case and then informed Ms. Cruz that her bankruptcy schedules and statements had not been filed, and that she should contact the office of the United States Trustee if she was dissatisfied with her counsel. Nov. 2 Hrg., Curtis, 118:11-20.

200. Based on her conversations with Ms. Cruz, Ms. Curtis believed that Ms. Cruz was distressed and worried. Nov. 2 Hrg., Curtis, 119:12-14.

201. Because Ms. Curtis believed that Ms. Cruz had not been receiving adequate legal representation and that her case might be dismissed, Ms. Curtis referred the matter to the office of the United States Trustee. Nov. 2 Hrg., Curtis, 119:15 – 120:10.

202. On July 30, 2018, Ms. Cruz called UpRight Law and Ms. Dominguez to advise that she wanted to terminate the firm's representation of her and receive a refund of her attorney's fee. Nov. 2 Hrg., Cruz, 59:2-6; Dec. 6 Hrg., Dominguez, 31:10-14.

203. Ms. Cruz spoke with several people at UpRight Law on July 30, 2018. Nov. 2 Hrg., Cruz, 102:8-9.

204. On July 30, 2018, UpRight Law first advised Ms. Cruz, through her son, that there was still time to file the necessary documents to avoid Ms. Cruz's bankruptcy case being dismissed. Nov. 2 Hrg., Cruz, 104:15-22, 106:5-7.

205. On July 30, 2018, Ms. Cruz spoke with Ms. Dominguez. Nov. 2 Hrg., Cruz, 59:15-16; Dec. 6 Hrg., Dominguez, 31:3-9.

206. During that July 30, 2018 conversation, Ms. Cruz told Ms. Dominguez that she wanted to terminate UpRight Law's representation of her and receive a refund of all monies she had paid to the firm. Nov. 2 Hrg., Cruz, 59:17-20, 61:22-25; Dec. 6 Hrg., Dominguez, 31:15-17.

207. At the time Ms. Cruz terminated UpRight Law's representation of her, the time had not expired to file the documents identified in the July 19, 2018 orders and notices. Dec. 6 Hrg., Galloway, 135:17 – 136:3.

208. Ms. Dominguez testified that during her July 30, 2018 conversation with Ms. Cruz, she attempted to dissuade Ms. Cruz from terminating UpRight Law's representation, but Ms. Cruz was panicked by the July 19, 2018 orders and notices indicating that her bankruptcy case would be dismissed if certain documents were not filed. Dec. 6 Hrg., Dominguez, 31:20 – 32:5.

209. Ms. Dominguez acknowledges that she should have communicated better with Ms. Cruz. Dec. 6 Hrg., Dominguez, 86:13-22, 101:12-21.

210. Ms. Dominguez holds herself personally responsible for all of the miscommunication between her and Ms. Cruz. Dec. 6 Hrg., Dominguez, 103:21 – 104:18. She feels she should have taken the initiative to call and communicate better with Ms. Cruz. Dec. 6 Hrg., Dominguez, 104:1-5.

211. Ms. Dominguez does not hold Ms. Cruz responsible for anything. Dec.6 Hrg., Dominguez,104:10-14.

212. On July 30, 2018, when Ms. Cruz terminated the services of UpRight Law and Ms. Dominguez, she asked UpRight Law for a refund of all the monies she had paid so she could get another attorney to handle her bankruptcy case. Nov. 2 Hrg., Cruz, 59:17-20, 61:22-25.

213. Ms. Cruz testified that UpRight Law told her she would not receive a full refund of all monies she had paid to the firm. Nov. 2 Hrg., Cruz, 62:6-8. According to Ms. Cruz, an UpRight Law representative later told Ms. Cruz they would give her a $300 refund but had to get it approved. Nov. 2 Hrg., Cruz, 107:12-18. Ms. Cruz also testified that the

representative explained that the firm could not give her a full refund because the firm had spent time working on her bankruptcy case Nov. 2 Hrg., Cruz, 108:6-8.

214. Mr. Galloway testified that UpRight Law prepared an accounting of the work the firm, including Ms. Dominguez, had performed prior to Ms. Cruz's termination of the firm's representation of her. Dec. 6 Hrg., Galloway, 138:11 – 139:21.

215. Mr. Galloway testified the value of the work performed by UpRight Law was $2,226.50. Dec. 6 Hrg., Galloway, 146:16-18.

216. Ms. Cruz testified that after UpRight Law's agent, who was talking over Ms. Cruz and not letting her complete her sentences, initially attempted to get Ms. Cruz to accept a $300 refund, he then advised Ms. Cruz she could receive $950 but not more because of "all the time that was spent working on [Ms. Cruz's] case." Nov. 2 Hrg., Cruz, 62:9-20; 107:12 – 108:8.

217. Ms. Cruz testified that UpRight Law advised her son, who in turn advised her, that the amount of the refund would be around $950. Nov. 2 Hrg., Cruz, 107:19 – 108:5.

218. Prior to Ms. Cruz's termination of UpRight Law's representation of her, Ms. Dominguez did not talk to Ms. Cruz about a motion for extension of time to file the bankruptcy schedules and statements. Dec. 6 Hrg., Dominguez, 59:25 – 60:7.

219. According to Ms. Dominguez, she intended to timely file the schedules and statements without an extension. Dec. 6 Hrg., Dominguez, 60:1-5.

220. After Ms. Cruz's termination of UpRight Law's representation of her, Ms. Dominguez did not feel comfortable filing a motion for extension of time to file the bankruptcy schedules and statements or anything else for Ms. Cruz. Dec. 6 Hrg., Dominguez, 60:10-13.

221. Ms. Dominguez never filed a Disclosure of Compensation of Attorney for Debtor in Ms. Cruz's bankruptcy case. Dec. 6 Hrg., Dominguez, 60:21 – 61:3.

222. Ms. Dominguez testified that she did not file a Disclosure of Compensation of Attorney for Debtor in Ms. Cruz's bankruptcy case because she did not believe she was supposed to file that document after Ms. Cruz terminated UpRight Law's representation of her. Dec. 6 Hrg., Dominguez, 61:4-8.

223. Ms. Dominguez understood that a Disclosure of Compensation of Attorney for Debtor is required to be filed within fourteen (14) days after the petition date.  Dec. 6 Hrg., Dominguez, 62:18-20.  Ms. Dominguez conceded it was her obligation to file, and did not need Ms. Cruz's consent to file, a Disclosure of Compensation of Attorney for Debtor. Dec. 5 Hrg., Dominguez, 62:23 – 63:5.

224. Ms. Dominguez testified that she believed the amounts that Ms. Cruz had paid to UpRight Law would be disclosed in the Statement of Financial Affairs filed by the attorneys Ms. Cruz subsequently hired to handle her bankruptcy case. Dec. 6 Hrg., Dominguez, 61:9-14.

225. Ms. Dominguez knew UpRight Law had acknowledged that the approved course of action would have been to file a Disclosure of Compensation of Attorney for Debtor or to seek guidance from the Court. Dec. 6 Hrg., Dominguez, 63:6-10. Ms. Dominguez also knew UpRight Law requested leave to file a Disclosure of Compensation of Attorney for Debtor. Dec. 6 Hrg., Dominguez, 63:11-14; ECF No. 65, ¶ 21.

226. On or around July 30, 2018, Ms. Cruz retained Oliva Law to represent her in her bankruptcy case. Nov. 2 Hrg., Cruz, 63:12-14.

227. After the Motion was filed, Ms. Cruz received a refund check in the amount of $933.50 from UpRight Law.   Mr. Cruz testified that she received the refund check on the first Thursday of October of 2018, or October 4, 2018.  Nov. 2 Hrg., Cruz, 63:7-11.

228. On August 3, 2018, the Oliva Law Firm filed the Debtor's Motion to Substitute Counsel. UST Ex. 10; ECF No. 12.

229. On August 3, 2018, Ms. Cruz, through the Oliva Law Firm, filed the Motion to Extend Time to File Schedules. UST Ex. 11; ECF No. 13.

230. On August 6, 2018, the Court entered the Order Granting Motion to Substitute Attorney. UST Ex. 12; ECF No. 14.

231. On August 6, 2018, the Court entered the Order Granting Motion to Extend Time to File Schedules, which extended the deadline for Ms. Cruz to file her missing schedules and statements by 14 days, from August 1, 2018 to August 15, 2018. UST Ex. 13; ECF No. 15.

232. On August 13, 2018, Ms. Cruz, through the Oliva Law Firm, filed various Bankruptcy Schedules, her Statement of Financial Affairs, and other documents. UST Ex. 14-19; ECF Nos. 18-23. Nov. 2 Hrg., Cruz, 64:1-9.

233. Oliva Law charged Ms. Cruz $1,765 for their legal services in Ms. Cruz's bankruptcy case. Nov. 2 Hrg., Cruz, 64:18-25; UST Ex. 21.

234. On August 22, 2018, Bianca Cruz, through the Oliva Law Firm, filed the Disclosure of Compensation of Attorney for Debtor. UST Ex. 21; ECF No. 25.

235. On September 14, 2018, the United States Trustee filed the Motion.  ECF No. 27.

236. On November 2, 2018, the Court held an evidentiary hearing on the Motion.

237. At the November 2, 2018 hearing on the Motion, Ms. Cruz testified. Nov. 2 Hrg., Cruz, 6:19.

238. At the November 2, 2018 hearing on the Motion, the Chapter 7 Trustee, Catherine Curtis, testified. Nov. 2 Hrg., Curtis, 115:10.

239. At the end of the November 2, 2018 hearing on the Motion, the Court continued the hearing to December 6, 2018. ECF No. 53.

240. At the December 6, 2018 hearing on the Motion, Ms. Dominguez testified. Dec. 6 Hrg., Dominguez, 7:2.

241. At the December 6, 2018 hearing on the Motion, Mr. Chern testified. Dec. 6 Hrg., Chern, 156:16.

242. At the time of the December 6, 2018 hearing on the Motion, Mr. Chern was the Managing Partner of UpRight Law. Dec. 6 Hrg., Chern, 157:1-2.

243. At the December 6, 2018 hearing on the Motion, Mr. Galloway testified. Dec. 6 Hrg., Galloway, 115:10.

244. At the time of the December 6, 2018 hearing on the Motion, Mr. Galloway was the Associate General Counsel and Vice President of Legal Delivery for UpRight Law. Dec. 6 Hrg., Galloway, 116:6-8.  In that role, Mr. Galloway was responsible for overseeing UpRight Law's Escalations Department and participating in the resolution of issues involving the firm's Partner Relations Department, Accounting and Finance Department, Intake Department, and Client Services Executives. Dec. 6 Hrg., Galloway, 116:23 – 117:8.

245. Mr. Galloway did not learn that Ms. Dominguez had failed to file a Disclosure of Compensation of Attorney for Debtor in Ms. Cruz's bankruptcy case until after the Motion was filed on September 14, 2018. Dec. 6 Hrg., Galloway, 128:24 – 129:6.

246. Neither Mr. Chern, nor Mr. Galloway, was aware of any alleged issues with regard to Ms. Dominguez's representation of Ms. Cruz until the Motion was filed on September 14, 2018. Dec. 6 Hrg., Galloway, 124:11-12; Dec. 6 Hrg., Chern, 166:6-12.

247. Ms. Dominguez acknowledged that she had several people at UpRight Law with whom she could communicate, including attorneys Patrick Early and Mike McEldowney.  Dec. 6 Hrg., Dominguez, 14:7-23.   Ms. Dominguez did not keep Mr.   Early or Mr. McEldowney informed about the Cruz engagement because she didn't think that anything unusual was happening.  Dec. 6 Hrg., Dominguez, 15:6-10.

248. Neither Mr.  Early, nor Mr. McEldowney, were the supervising attorneys who would have overseen Ms. Dominguez. Dec. 6 Hrg., Galloway, 133:23 – 134:5.  Neither Mr.

Early, nor Mr. McEldowney, monitored Ms. Dominguez's cases, nor did they review drafts of any documents before they were filed. Dec. 6 Hrg., Dominguez, 16:1-12.

249. There was no one individual assigned to act as Ms. Dominguez's supervising attorney at UpRight Law. Dec. 6 Hrg., Galloway, 134:7-13.

250. UpRight Law has multiple supervising attorneys who work in its Chicago office and have different areas of supervision, and who regularly communicate with the firm's partners. Dec. 6 Hrg., Galloway, 134:13-19. At the time of the December 6, 2018 hearing on the Motion, UpRight Law's supervising attorneys included (i) Kevin Chern, the Managing Partner, (ii) Craig Sonnenschein, the General Counsel, (iii) David Menditto, (iv) Ryan Galloway, and (v) Jocelyn Galloway, the firm's Corporate and Compliance Counsel. Dec. 6 Hrg., Galloway, 134:21 – 135:4.

251. UpRight Law tracks and monitors a case from the time a client is paid in full to the time that the case is filed. Dec. 6 Hrg., Chern, 177:12-24. In Ms. Cruz's bankruptcy case, Mr. Chern did not believe there was any reason for concern about that length of time. Dec. 6 Hrg., Chern, 177:25 – 178:8.

252. Ms. Dominguez testified that she did not escalate any issues she may have been having with Ms. Cruz to any supervising attorneys at UpRight Law. Dec. 6 Hrg., Galloway, 135:5-11.

253. Mr. Galloway testified that he did not know whether any of the multiple supervising attorneys had specific knowledge of Ms. Cruz's bankruptcy case prior to the filing the Motion. Dec. 6 Hrg., Galloway, 136:4-17. Mr. Chern testified that prior to the Motion being filed, he was unaware of anything that had gone on in Ms. Cruz's bankruptcy case. Dec. 6 Hrg., 166:6-12.

254. Mr. Chern testified that he did not consider it to be a best practice for a bankruptcy petition to be filed after a substantial passage of time from the date it was signed by the client. Dec. 6 Hrg., Chern, 168:19 – 169:11; 179:10-13. Ms. Dominguez's decision to file a bankruptcy petition that erroneously represented that Ms. Cruz signed it on July 18, 2018 caused Mr. Chern concern. Dec. 6 Hrg., Chern, 180:10 – 181:21.

255. Mr. Chern also testified that Ms. Dominguez's decision to write the July 18, 2018 date under Ms. Cruz's signature in Respondents' Exhibit 11 caused him concern. Dec. 6 Hrg., Chern, 181:16-21.

256. UpRight Law policy requires a partner to obtain the wet signatures on every single case file. Dec. 6 Hrg., Galloway, 132:16 – 133:10.

257. UpRight Law audits its partners on a periodic basis multiple times per year to ensure that they adhere to the policy of obtaining wet signatures. Dec. 6 Hrg., Galloway, 132:16 – 133:10. Ms. Cruz's bankruptcy case was not one that had been audited by the home office. Dec. 6 Hrg., Chern, 177:9-11.

258. Ms. Dominguez's failure to file a Disclosure of Compensation of Attorney for Debtor in Ms. Cruz's bankruptcy case was unacceptable to Mr. Chern. Dec. 6 Hrg., Chern, 166:20-25. Mr. Chern testified that he believed Ms. Dominguez misunderstood her obligations under the law in failing to file a disclosure of compensation and made a mistake. Dec. 6 Hrg., Chern, 167:1-23.

259. Mr. Chern also testified that, with the benefit of hindsight, he would have filed a motion to extend time to file the bankruptcy schedules, statements and other documents. Dec. 6 Hrg., Chern, 167:24 – 168:7.

260. UpRight Law and Ms. Dominguez have acknowledged that Ms. Dominguez should have filed a Disclosure of Compensation of Attorney for Debtor in Ms. Cruz's bankruptcy case. ECF No. 65, at p. 12; Dec. 6 Hrg., Galloway, 129:3-6; Dec. 6 Hrg., Chern, 166:20-25.

261. On December 6, 2018, at the conclusion of Ms. Dominguez's testimony at the hearing on the Motion, the Court asked Ms. Dominguez if she had the original of Respondents Exhibit 11, which purported to be a true and accurate copy of a bankruptcy petition bearing Ms. Cruz's wet signature. Dec. 6 Hrg., Dominguez, 111:18-23. Ms. Dominguez testified, "Yes, I should have it, Your Honor." Dec. 6 Hrg., Dominguez, 111:18-23. When asked by the Court if it was the same document filed at ECF No. 1 in this case," Ms. Dominguez testified, "Yes, it is, Your Honor." Dec. 6 Hrg., Dominguez, 111:18-23.

262. On December 6, 2018, at the conclusion of Ms. Dominguez's testimony at the hearing on the Motion, the Court directed Ms. Dominguez and her counsel, David Menditto, to deliver the original bankruptcy petition bearing Ms. Cruz's wet signature to the Clerk of Court, who would in turn deliver the document to the Court. Dec. 6 Hrg., Dominguez, 114:11-22.

263. Ms. Curtis testified that Ms. Cruz's bankruptcy case is a relatively simple chapter 7 bankruptcy case. Nov. 2 Hrg., Curtis, 118:21-23. She also testified that the fee customarily charged in this locality for similar legal services is $2,100. Nov. 2 Hrg., Curtis, 118-21-23. According to Ms. Curtis, the fees paid to Ms. Cruz to UpRight Law are on the high end of the spectrum for a consumer case. Nov. 2 Hrg., Curtis, 119:6-11.

264. Ms. Dominguez testified that Ms. Cruz's bankruptcy case is not a complex case. Dec. 6 Hrg., Dominguez, 9:8-16. In Ms. Dominguez's experience, the fee customarily charged in this locality for similar legal services is in the range of $1,800 to $2,200. Dec. 6 Hrg., Dominguez, 9:17-10:2. For a case like Ms. Cruz's bankruptcy case, Ms. Dominguez would charge in the range of $2,000 to $2,200. Dec. 6 Hrg., Dominguez, 10:3-6.

265. Mr. Galloway testified that although there were no great legal complexities presented by Ms. Cruz's assets or income, he felt the case became complicated because of communication failures. Dec. 6 Hrg., Galloway, 123:11 – 124:4.

266. Ms. Dominguez testified that under her partnership agreement with UpRight Law, she receives thirty-three percent (33%) of the attorney's fee paid by the debtor. Dec. 6 Hrg., Dominguez, 91:14-92:5. A certain percentage of that compensation is paid upon the filing of a bankruptcy case, and the remaining percentage is paid upon the issuance of a discharge order. Dec. 6 Hrg., Dominguez, 92:6-12.

267. Ms. Dominguez received the sum of $550 from UpRight Law in connection with Ms. Cruz's bankruptcy case. Dec. 6 Hrg., Dominguez, 63:19-23.

268. The Court admitted the United States Trustee's Exhibits 1 through 27 and Respondents' Exhibit 11. Nov. 2 Hrg., 5:7-19; Dec. 6 Hrg., 5:2-23, 45:21-47:10; see also ECF 51. The Parties did not offer into evidence any other exhibits in connection with the evidentiary hearings held on November 2, 2018 and December 6, 2018.

269. The Parties rested. Dec. 6 Hrg., 191:5-20. The Court granted the motion of the United States Trustee to conform the evidence under Fed. R. Bankr. P. 7015(b)(2). Dec. 6 Hrg., 191:22 – 195:8.

### December 6, 2018 Minute Order

270. When asked by the Court, Ms. Dominguez responded that she had possession of the original wet signature bankruptcy petition for Ms. Cruz's bankruptcy case and that it was in blue ink. Dec. 6 Hrg., Dominguez, 111:18-20; 114:3-6.

271. The Court then advised Mr. Menditto that the Court wanted the original of Exhibit 11 with the blue ink signature. Dec. 6 Hrg., 114:11-19. Mr. Menditto responded that he would comply with the Court's directive and asked Ms. Dominguez to confirm that she had the original of Respondents Exhibit 11. Dec. 6 Hrg., Menditto, 114:16-20. Ms. Dominguez responded once again that she had the original of Exhibit 11 with the wet signature, but it was not in her possession at the hearing that day. Dec. 6 Hrg., Dominguez, 114:19-21.

272. Mr. Menditto's efforts to obtain the original copy of Ms. Cruz's bankruptcy petition bearing her wet signature are detailed in Section II.F, *infra*.

273. In an email dated December 17, 2018, Mr. Menditto informed Ms. Chavez, the Court's case manager, that Ms. Dominguez was ill and needed more time to deliver the original wet signature bankruptcy petition. ECF No. 67.

274. On December 19, 2018, Mr. Menditto sent Ms. Dominguez an email informing her that UpRight Law was severing their relationship with her. Menditto Ex. 21 at 0254.

275. On December 19, 2018, Mr. Menditto filed an *Emergency Motion for Leave to Withdraw Attorney Appearance by David M. Menditto for Marina Dominguez* [ECF 69] ("Motion for Leave to Withdraw"), in which he stated, among other things, that after reviewing a document that Ms. Dominguez had represented was a color scanned copy of the original

bankruptcy petition bearing Ms. Cruz's wet signature, he developed doubts about the accuracy of that representation. ECF No. 69, at ¶ 3.

276. On December 27, 2018, the Court entered the *Order to Show Cause Why David M. Menditto and Marina Dominguez Should Not Be Held in Contempt* (previously defined as the "Show Cause Order") for failing to deliver the original wet signature bankruptcy petition as required by the December 6, 2018 minute order. ECF No. 72. The Court held evidentiary hearings on the Show Cause Order on March 6 and April 26, 2019 and entered minute orders sealing the transcripts of said hearings pending entry of further orders. ECF Nos. 93 and 111.

277. On February 26, 2019, the Court entered the *Protective Order*. ECF No. 88.

### *March 6, 2019 Hearing*

278. At the evidentiary hearing held on March 6, 2019, Mr. Menditto testified regarding his efforts to obtain the original wet signature bankruptcy petition from Ms. Dominguez in connection with the Show Cause Order. Mar. 6 Hrg., Menditto, 17:1 – 47:12.

279. Mr. Menditto also testified that Ms. Dominguez confirmed on multiple occasions that she had possession of the original wet signature bankruptcy petition. Mar. 6 Hrg., Menditto, 34:19-21.

280. Ms. Dominguez also testified at the March 6, 2019 hearing on the Show Cause Order. Mar. 6 Hrg., Dominguez, 52:16 – 58:16. During her testimony, Ms. Dominguez indicated that she did not dispute, and "pretty much agree[d] with everything that [Mr. Menditto had] stated." Mar. 6 Hrg., Dominguez, 53:1-3.

281. During the March 6, 2019 hearing, the Court admitted Menditto Exhibits 1-22 into evidence. Mar. 6 Hrg., Menditto, 45:7-17.

282. Mr. Menditto presented a redacted copy of his Verizon cellular telephone records, which showed calls between him and Ms. Dominguez during the period October 18, 2018—which was immediately after Mr. Menditto became aware that the Court had ordered Mr. Chern and Mr. Galloway to appear in Court on November 2, 2018 in connection with the United States Trustee's Motion—through November 2, 2018. Mar. 6 Hrg., Menditto, 17:2 – 18:4; Menditto Ex. 1 at 0005- 0013.

283. Mr. Menditto met in-person with Ms. Dominguez on November 1, 2018 to prepare for the November 2, 2018 hearing on the Motion. Mar. 6 Hrg., Menditto, 18:9-13; Menditto Ex. 2 at 0014. During that meeting, Mr. Menditto confirmed with Ms. Dominguez the document he would later present into evidence at the November 2, 2018 hearing as Respondents' Exhibit 11 represented a true and accurate copy of the original wet signature bankruptcy petition signed by Ms. Cruz. Mar. 6 Hrg., Menditto, 18:13-16. Neither Mr. Menditto nor Ms. Dominguez testified that the original wet signature bankruptcy petition was examined before Respondents Exhibit 11 was presented to the

Court as a true and accurate copy signed by Ms. Cruz at the November 2 and December 6, 2019 hearings. Mar. 6 Hrg., Menditto, 4:2-64:25. Such efforts were undertaken by phone calls and text messages after the December 6, 2018, hearing. Mar. 6 Hrg., Menditto, 34:22-35:7.

284. Mr. Menditto presented the Court with Menditto Exhibit 3, which was a transcript of the December 6, 2018 hearing on the Motion. Mar. 6 Hrg., Menditto, 18:17-19; Menditto Ex. 3 at 0015-0216. Mr. Menditto read the portion of the transcript in which the Court asked Ms. Dominguez whether she had possession of Ms. Cruz's original wet signature bankruptcy petition and directed Mr. Menditto to deliver that original document to the Clerk of Court. Mar. 6 Hrg., Menditto, 19:22 – 20:22; Menditto Ex. 3 at 0125-0129.

285. Following the December 6, 2018 hearing on the Motion, Mr. Menditto spoke with Ms. Dominguez regarding what they were going to do in order to obtain the original wet signature bankruptcy petition and deliver it to the Clerk of Court. Mar. 6 Hrg., Menditto, 21:1-6. Mr. Menditto offered to go to Ms. Dominguez's office with her, but Ms. Dominguez indicated that she was not certain the document was at her office or at her home. Mar. 6 Hrg., Menditto, 21:9. Mr. Menditto had to be in Kansas City the next morning and so did not stay in town to go for the document. Mar. 6 Hrg., Menditto, 21:13-15.

286. Later that evening, at 10:05 p.m., Mr. Menditto spoke with Ms. Dominguez by telephone. Mar. 6 Hrg., Menditto, 21:16 – 22:4; Menditto Ex. 4 at 0220; Menditto Ex. 5 at 223. During that conversation, Ms. Dominguez indicated that she "did not have the document but would continue looking for it." Mar. 6 Hrg., Menditto, 22:2-4.

287. On Sunday, December 9, 2018, Mr. Menditto sent Ms. Dominguez a text message in which he inquired as to whether she had found Ms. Cruz's original wet signature bankruptcy petition. Mar. 6 Hrg., Menditto 22:6-11; Menditto Ex. 6 at 0224. Ms. Dominguez responded that she had found the document and would take photos of the document, make a color scanned copy of the document, and send them to Mr. Menditto. Mar. 6 Hrg., Menditto, 22:12-17; Menditto Ex. 6 at 0224. Mr. Menditto replied that Ms. Dominguez could do that on Monday, December 10, 2018. Mar. 6 Hrg., Menditto 22:18-20; Menditto, Ex. 6 at 0224.

288. On Monday, December 10, 2018, Mr. Menditto left a voicemail message for, and sent two text messages to, Ms. Dominguez following up on their text exchange the previous day in which Ms. Dominguez had indicated she would send color photos and a color scanned copy to Mr. Menditto of the document the Court had ordered be produced. Mar. 6 Hrg., Menditto, 23:2- 15; Menditto Ex. 4 at 0220; Menditto, Ex. 7 at 0225. Later that evening, Ms. Dominguez replied to Mr. Menditto via a text message in which she explained that she had been unable to send the photos and copy of the document and indicated she would send the photos and copy to Mr. Menditto after she "grab[bed] a bite to eat " Mar. 6 Hrg., Menditto, 23:16-23; Menditto Ex. 8 at 0226.

289. Ms. Dominguez did not send Mr. Menditto photos or a scanned color copy of Ms. Cruz's original wet signature bankruptcy petition on December 10, 2018. Mar. 6 Hrg., Menditto, 23:24.

290. The following morning, December 11, 2018, Mr. Menditto left a voicemail message for Ms. Dominguez in which he indicated that he had not received the photos and copy of the document and wanted Ms. Dominguez to call him back. Mar. 6 Hrg., Menditto, 23:25 – 24:4; Menditto Ex. 4 at 0221.

291. Mr. Menditto also sent Ms. Dominguez a text message on the morning of December 11, 2018 in which he reiterated the importance of providing the Court with Ms. Cruz's original wet signature bankruptcy petition. Menditto Ex. 9 at 0227.

292. Thereafter, on the morning of Friday December 14, 2018, Mr. Menditto sent Ms. Dominguez a text message in which he stated:

Good morning, Marina. Please call me as soon as possible. We need to discuss that document. I don't want an order to show cause issues (sic) against me.

Mar. 6 Hrg., Menditto, 24:17-24, Menditto Ex. 9 at 0227.

293. Shortly after sending this text, Mr. Menditto placed two telephone calls to Ms. Dominguez, leaving a voicemail message during the second call asking Ms. Dominguez to call him back to discuss the document. Mar. 6 Hrg., Menditto, 24:25 – 25:7; Menditto Ex. 4 at 0221.

294. Later that day, in the afternoon of December 14, 2018, Mr. Menditto left a voicemail message for Ms. Dominguez, which he followed up with the following text message:

Marina, in follow up to my voicemail, it is imperative that I speak with you regarding the draft petition. Judge Rodriguez is going to question what is taking so long. We don't want an order to show cause to be issued.

Mar. 6 Hrg., Menditto, 25:8-18; Menditto Ex. 11 at 0229.

295. Shortly thereafter, at 4:01 p.m., Mr. Galloway reached out to Ms. Dominguez via telephone and, based on his standard practice, believed he left her a voicemail message. Mar. 6 Hrg., Galloway, 60:18 – 61:9; Menditto Ex. 12 at 0230.

296. Then, at 4:07 p.m., Ms. Dominguez telephoned Mr. Menditto. Mar. 6 Hrg., Menditto, 26:2-4; Menditto Ex. 4 at 221. Mr. Menditto testified about his conversation with Ms. Dominguez as follows:

During that conversation, Ms. Dominguez was apologetic. She had indicated that she had been very ill and bedridden for the better part of the week.

I asked Ms. Dominguez if there was anyone who could assist her driving her to her office and helping her get the document color scanned and emailed and FedExed to me. At that point, I felt the best way to ensure that the document got to the Court was for Ms. Dominguez just to get it to me and then I could figure out how to deliver it to the Court.

Ms. Dominguez mentioned that her father might be able to do so and then she indicated that she would make a color scanned copy of the document and email it to me the next day, which was a Saturday. She also indicated she would FedEx it to the -- my office so I could get it on Monday. I did not hear back from Ms. Dominguez on Saturday.

Mar. 6 Hrg., Menditto, 26:11 – 27:2.

297. On the morning of Sunday, December 16, 2018, Mr. Menditto sent Ms. Dominguez the following text message:

Marina, I did not hear from you yesterday (Saturday).

Did you get the document scanned into a .pdf? If so, please email it to me.

Did you FedEx the document to me? If so, please send me the tracking number so that I can track it.

THIS IS VERY IMPORTANT.

Please call me.

Mar. 6 Hrg., Menditto, 27:3-12; Menditto Ex. 13 at 0231.

298. Later that day, at 11:47 a.m. and 6:19 p.m., Mr. Menditto attempted to reach  Ms. Dominguez by telephone, but did not speak with her. Mar. 6 Hrg., Menditto, 27:13-19; Menditto Ex. 4 at 0222.

299. On Monday, December 17, 2018, Mr. Menditto sent an email to the Court's case manager, Ms. Chavez, to inform her as to the status of his efforts to obtain the document the Court had ordered be produced, of Ms. Dominguez's recent illness, and of Mr. Menditto's plan regarding how he would provide the Clerk of Court with the original document. Mar. 6 Hrg., Menditto, 27:24 – 28:12; Menditto Ex. 14 at 0232. Later that day, Ms. Chavez filed a copy of Mr. Menditto's email with the Court. ECF No. 67; Menditto Ex. 15 at 0233-0234.

300. After Mr. Menditto sent his email to Ms. Chavez, he left two voicemail messages for Ms. Dominguez at 9:46 a.m. and 12:29 p.m. Mar. 6 Hrg., Menditto, 28:13-18; Menditto Ex. 16 at 0235.

301. Also, on December 17, 2018, at 10:01 a.m., Mr. Menditto sent a text message to Ms. Dominguez in which he stated:

Marina, I need to speak with you as soon as possible. I realize that you are ill and forgive me if the illness is so severe that you are unable to call or text me, but as soon as you are able to do so, please call me.

Getting that document to Judge Rodriguez is extremely important. If I need to have someone (you mentioned your father) go to your home to get your office keys and have him get the document, I will pay him for his time.

Thank you.

Mar. 6 Hrg., Menditto, 28:19 – 29:5; Menditto Ex. 17 at 0242-0243.

302. Later that day, Mr. Menditto spoke with Ms. Dominguez. Mar. 6 Hrg., Menditto, 29:6-7. Ms. Dominguez indicated that she had the document and that the document showed that prior to her affixing the July 18th, 2018 date on the document, there actually had been a February date printed on the line that she had whited out. Mar. 6 Hrg., Menditto, 29:7-11. According to Ms. Dominguez, if one were to look at the back side of the document, that person would see that there was a February date originally on there, which had been whited out prior to the July 18th, 2018 date being written on it. Mar. 6 Hrg., Menditto, 29:12-15.

303. Following this conversation, Ms. Dominguez sent an email to Mr. Menditto that purported to attach a color scanned copy of the original wet bankruptcy petition that had been presented into evidence at the December 6, 2018 hearing on the Motion as Respondents' Exhibit 11. Mar. 6 Hrg., Menditto, 29:2 – 30:1; Menditto Ex. 20 at 0246-0253. The color scanned copy that Ms. Dominguez represented was Ms. Cruz's original wet signature bankruptcy petition was presented into evidence as Menditto Exhibit 20. Menditto Ex. 20 at 0246-0253.

304. After receiving what Ms. Dominguez had represented to be a scanned color copy of Ms. Cruz's original wet signature bankruptcy petition, Mr. Menditto enlarged the signature of Ms. Cruz, the date under Ms. Cruz's signature, and the date next to Ms. Dominguez's signature in Respondents' Exhibit 11 (Menditto Exhibit 22) and in Menditto Exhibit 20. Mar. 6 Hrg., Menditto, 41:11 – 42:21; Resp. Ex. 11 at 00153 (Menditto Ex. 22 at 0261); Menditto Ex. 20 at 0252. Mr. Menditto concluded that the date under Ms. Cruz's signature in Menditto Exhibit 20 was not consistent with the date under Ms. Cruz's signature in Respondents' Exhibit 11 (Menditto Exhibit 22). Mar. 6 Hrg., Menditto, 42:2-15.

305. Following Mr. Menditto's inspection of Exhibit 20 and the doubt he developed as to whether it reflected a color scanned copy of the original wet bankruptcy petition that had been presented into evidence at the December 6, 2018 hearing on the Motion as Respondents' Exhibit 11, Mr. Menditto telephoned Ms. Dominguez. Mar. 6 Hrg., 29:23-30:24; Menditto Ex. 16 at 0235.

306. Mr. Menditto testified about that conversation as follows:

I called Ms. Dominguez and had a 21-minute conversation with her in which I reviewed the reason for my doubt that our previously submitted Exhibit 11 accurately reflected the document that she had submitted to me on December 17th. During that conversation, I informed Ms. Dominguez that I believed we needed to advise the Court of a potential inconsistency, certainly of the doubt that I had formed and that a document I had submitted to the Court may not have been as I represented it to me through Ms. Dominguez's testimony. I also indicated that I believe she and I may have a conflict on that issue at this point.

Mar. 6 Hrg., Menditto, 31:1-11.

307. Thereafter, Mr. Menditto advised his General Counsel of what had happened, and his General Counsel indicated he would consult with outside ethics counsel. Mar. 6 Hrg., Menditto, 31:22 – 32:3.

308. Mr. Menditto, in consultation with his General Counsel and outside ethics counsel, resolved to do the following:

a.   Withdraw his appearance as counsel of record for Ms. Dominguez.

b.   Notify the Court and request to appear before the Court to "explain it.".

c.   Notify Ms. Dominguez that UpRight Law was severing its relationship with her.

Mar. 6 Hrg., Menditto, 32:4-13.

309. The following morning, on December 19, 2018, Mr. Menditto had a telephone conversation with Ms. Dominguez in which he advised her of the steps that he and UpRight Law would be taking. Mar. 6 Hrg., Menditto, 32:14-19; Menditto Ex. 16 at 0235.

310. Mr. Menditto had never seen and never had possession of a document purporting to be Ms. Cruz's original wet signature bankruptcy petition. Mar. 6 Hrg., Menditto, 43:11 – 45:4.

311. At the end of Mr. Menditto's testimony at the March 6, 2019 hearing, the Court asked him to describe the controls he had in place to ensure that a document provided by an UpRight Law partner as being a true and accurate copy of a client's bankruptcy petition was in fact what it purported to be. Mar. 6 Hrg., Menditto, 46:23-25. Mr. Menditto responded:

Your Honor, at that time[,] for a matter like this, I relied on the representations of the attorneys whom I represented as officers of the Court because requests for wet signature documents typically come from the local Bankruptcy Court in matters. We did not ask for

the local partners to send those documents to where they're out of their possession. I realize that having the requirements that we have now would have avoided that in this case and I regret it, Your Honor.

Mar. 6 Hrg., Menditto, 47:1-9.

312. Following Mr. Menditto's testimony, Ms. Dominguez testified that: (a) when she found the original wet signature bankruptcy petition, the date itself had been whited out; (b) she did not prepare a new form for Ms. Cruz to sign; (c) she used the old draft that she had prepared in February with the whited out date; (d) Ms. Cruz signed the old draft but did not date it; and (e) she signed and dated it. Mar. 6 Hrg., Dominguez, 52:17 – 54:13.

313. Ms. Dominguez testified that when she initially provided Mr. Menditto with a copy of Ms. Cruz's original wet signature bankruptcy petition, she had copied the original petition with the whited-out date, and then dated the copy (as opposed to the original), and forwarded it to Mr. Menditto. Mar. 6 Hrg., Dominguez, 52:17 – 54:13. Ms. Dominguez did not have an explanation for why she did this. Mar. 6 Hrg., Dominguez, 52:17 – 54:13.

314. Ms. Dominguez testified that when she provided Mr. Menditto with what she represented was Ms. Cruz's original wet signature bankruptcy petition in December of 2018, Ms. Dominguez had gone back to the original document with the whited-out signature and wrote the July 18, 2018 date on top of the white out. Mar. 6 Hrg., Dominguez, 52:17 – 54:13.

315. Ms. Dominguez admitted that what she did was not the right thing to do and that she had made a bad decision. Mar. 6 Hrg., Dominguez, 52:17 – 54:13.

316. On March 6, 2019, the Court entered the Order granting the Motion for Leave to Withdraw. ECF No. 94.

317. On April 25, 2019, the Court entered the *Order Granting the Motion to Reopen Evidence.* ECF No. 109.

### *April 26, 2019 Hearing*

318. Menditto Exhibit 22 is the same as Respondents' Exhibit 11, which was used in November 2 and December 6, 2018 hearings.  Apr. 26 Hrg., Dominguez, 8:14 – 9:25.

319. According to Ms. Dominguez, Ms. Cruz signed Menditto Exhibit 22 in June of 2018. Apr. 26 Hrg., Dominguez, 10:6-14; Menditto Ex. 22 at 0261.  Ms. Dominguez wrote "7/18/18" on the line that says, "Executed on."  Apr. 26 Hrg., Dominguez, 10:18-20; Menditto Ex. 22 at 0261.  She admits that doing this could mislead the Court, the creditors, the chapter 7 trustee, the United States Trustee and other parties in interest because it purports to say that Ms. Cruz signed it on July 18, 2018, when Ms. Dominguez, in fact, knew it had not been signed by Ms. Cruz on that date.  Apr. 26 Hrg., Dominguez, 11:8-23; Menditto Ex. 22 at 0261.

320. Ms. Dominguez was aware: (a) of the requirements under Bankruptcy Local Rule 5005-1, which adopted the Texas Statewide Procedures for Electronic Filing; (b) that the Declaration for Electronic Filing was due within seven business days; and (c) that the record in this case reflects that she did not file a Declaration for Electronic Filing. Apr. 26 Hrg., Dominguez, 13:16 -15:13.

321. Ms. Dominguez was not required to provide anyone at UpRight Law with the original wet signature bankruptcy petition in this case prior to the Court's December 6, 2018 minute order. Apr. 26 Hrg., Dominguez, 17:14-20.

322. Ms. Dominguez does not recall whether she was informed that the United States Trustee had made an informal request on October 30, 2018, for the original wet signature bankruptcy petition in an email that was sent to Mr. Menditto. Apr. 26 Hrg., Dominguez, 24:1- 4.

323. Ms. Dominguez testified she had health problems involving her bronchioles ("[b]reathing, coughing, chest congestion, that sort of stuff") for about five to seven days between December 6 and 19, 2018. Apr. 26 Hrg., Dominguez, 26:2 – 27:11. She testified her health problems caused a delay in her compliance with the Court's December 6, 2018 minute order of about five to seven days beginning around December 9, 2018. Apr. 26 Hrg., Dominguez, 27:22 – 28:15.

324. Ms. Dominguez does not contest any of Mr. Menditto's testimony on March 6, 2019. Apr. 26 Hrg., Dominguez, 39:19 – 40:15.

325. The Court admitted Dominguez Exhibit 1, which Ms. Dominguez testified is the original wet signature bankruptcy petition. Apr. 26 Hrg., Dominguez, 66:19–22; Dominguez Ex. 1. Ms. Dominguez did not produce Dominguez Exhibit 1 until April 26, 2019. Apr. 26 Hrg., Dominguez, 40:21 – 41:7.

326. Ms. Dominguez admits that the date under Ms. Cruz's alleged signature in Menditto Exhibit 22 does not match the date under Ms. Cruz's alleged signature in Dominguez Exhibit 1. Id. at 51:11–16. Ms. Dominguez wanted the dates under Ms. Cruz's alleged signature in Menditto Exhibit 22 and Dominguez Exhibit 1 to look the same. Apr. 26 Hrg., Dominguez, 51:17 – 52:3.

327. Ms. Dominguez admits that she made the modification to Dominguez Exhibit 1 while she was a local partner for UpRight Law. Apr. 26 Hrg., Dominguez, 55:11–14.

328. Ms. Dominguez testified that during her tenure as a partner of UpRight Law, the firm had a policy in place that required all partners to obtain wet signatures of clients on documents that will bear the client's "/s/" signature in court filings. Apr. 26 Hrg., Dominguez, 55:19 – 56:1. Ms. Dominguez testified that UpRight Law made this policy known to its partners in writing. Apr. 26 Hrg., Dominguez, 56:2-3.

329. Ms. Dominguez testified that during her tenure as a partner of UpRight Law, the firm had a wet signature audit policy in place whereby the firm would periodically ask partners to provide original wet signature documents they had obtained from clients.  Apr.  26 Hrg., Dominguez, 56:6-17.

330. Ms.  Dominguez's understanding was that the purpose of UpRight Law's wet signature audit policy was to ensure that partners were complying with the firm's wet signature policy. Apr. 26 Hrg., Dominguez, 18-21.

331. On July 23, 2019, the Court entered the Order Granting Motion (1) Challenging Designation of Information or Documents as Confidential Communications Protected by the Attorney-Client Privilege; (2) Vacating the Protective Order; and (3) Unsealing the Transcripts of the March 6 and April 26 Court Hearings.  ECF No. 123.

## II.  CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

The  Court  holds  jurisdiction  pursuant  to  28  U.S.C.  §  1334  and  now  exercises  its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[13]  The matter before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because the acts leading to the U.S. Trustee's Motion and the issuance of the Show Cause Order concern the administration of the Debtors' bankruptcy case.  Further, this dispute is a core proceeding pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2).[14]

Additionally, the acts that led to the issuance of the Show Cause Order mainly concerns the conduct of attorneys who were counsel for Cruz.  The Court has the power to police conduct of attorneys who appear in this Court and to take action with respect to those attorneys who misbehave.[15]  Therefore, the circumstances before the Court make this dispute a core proceeding, and the Court holds constitutional authority to enter a final order.[16]  Nevertheless, to the extent

---

[13] *In re*: *Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).
[14] *See Southmark Corp. v. Coopers & Lybrand* (*In re Southmark Corp.*), 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").
[15] *Chambers v. NASCO*, 501 U.S. 32 (1991); *Knight v. Luedtke* (*In re Yorkshire, LLC*), 540 F.3d 328, 332 (5th Cir. 2008).
[16] *See Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015); *Stern v. Marshall*, 564 U.S. 462

these are non-core matters, parties may consent to the entry of final orders by this Court on non-core matters.[17]   The U.S. Trustee filed its notice of consent to the entry of final orders on all non-core matters by the Bankruptcy Court on September 14, 2018,[18] and UpRight Law filed its notice of consent on October 26, 2018.[19]   In the Joint List of Stipulated and Disputed Facts, all parties consented to the entry of a final order or judgment by this Court in this matter.[20]   Therefore, even if the matters before the Court are non-core matters, all parties have consented, and this Court holds the constitutional authority to enter a final order and judgment.

Finally, venue is governed by 28 U.S.C. §§ 1408, 1409. Venue is proper because Debtor's principal residence has been in the Southern District of Texas for the 180 days immediately preceding her petition date.[21]

## B.   The U.S. Trustee's Motion & the Court's Show Cause Order

In its Motion, the U.S. Trustee seeks (1) disgorgement of attorney's fees under § 329, the Court's inherent authority, and its power under § 105, (2) cancellation of the Engagement Agreement under § 329, the Court's inherent authority, and its power under § 105, (3) civil penalties under § 526(c)(5)(B), and (4) sanctions under the Court's inherent authority and its power under § 105.   Lastly, the Court issued its own Show Cause Order regarding UpRight Law's Exhibit No. 11 which purportedly constituted Debtor's original wet signature and date on the bankruptcy petition.   The Court will take each one in turn.

### 1.   Failure to Disclose Fees Under § 329(a)

One of the cornerstones of the regulatory structure in bankruptcy law is the necessity for

---

(2011).
[17] *Id.*
[18] ECF No. 27.
[19] ECF No. 46.
[20] ECF No. 157 at 4.
[21] *See* ECF No. 1; Case No. 18-32494, ECF No. 1.

attorneys to fully and honestly disclose their transactions with clients.[22]   This structure is embodied by § 329(a).  Under § 329(a), a debtor's attorney is required to disclose to the court the amount of compensation paid or promised for services rendered "in contemplation of or in connection with the case."[23]   Section 329 should be read in conjunction with Rule 2016, requiring that every attorney for a debtor must file the statement required by § 329 within 14 days after the filing of the petition unless otherwise directed by the court.[24]   Rule 2016(b) imposes a continuing duty on debtor's counsel to supplement the original statement pursuant to § 329(a).  This Court must determine whether Dominguez and Upright Law timely disclosed a statement of compensation.[25]

Here, Dominguez filed Cruz's Chapter 7 petition on July 18, 2018.[26]  Before the petition date, Cruz made monthly payments totaling $3,135 to UpRight Law from July of 2016 through July of 2017, consisting of $2,800 in attorney's fees and $335 in filing fees.[27]  On December 4, 2017, Cruz paid UpRight Law an additional $25 fee to "reinstate" her bankruptcy case after an alleged suspension of her file.[28]  In all, Cruz paid a total of $3,160 to UpRight Law.

Upon filing an original petition, there is a strict duty of disclosure. The disclosure requirements of § 329(a) are mandatory, not permissive, and apply "whether or not the attorney ever applies for compensation."[29]  The original petition filed by Dominguez and Upright Law is wholly void of any disclosure of compensation as required by Section 329(a). In fact, Dominguez testified that she never filed a disclosure of compensation for Cruz's bankruptcy

---

[22] *In re Mayeaux*, 269 B.R. 614, 620 (Bankr. E.D. Tex. 2001).
[23] 11 U.S.C. § 329(a).
[24] FED. R. BANKR. P. 2016(b); 3 Collier on Bankruptcy P 329.03 (16th 2020).
[25] *See In re Lira*, 2006 Bankr. LEXIS 3549 at *7 (Bankr. S.D. Tex. Dec. 15, 2006).
[26] ECF No. 1.
[27] ECF No. 157 at 17.
[28] Min. Entry Nov. 2, 2018; ECF No. 157.
[29] *In re Wright*, 578 B.R. 570 (Bankr. S.D. Tex. 2017).

case,[30] and that she did not file a disclosure of compensation because she did not believe she was supposed to file that document after Cruz terminated UpRight Law's representation of her.[31] Dominguez further understood that a disclosure of compensation is required to be filed within fourteen (14) days after the petition date,[32] she conceded it was her obligation to file it, and she recognized that she did not need Cruz's consent to file it.[33]   Therefore, it is undisputed that Dominguez and Upright Law failed to disclose a statement of compensation in Cruz's bankruptcy case.[34]

In defense, Dominguez and UpRight Law argue that UpRight Law has fully refunded, through a payment to Cruz's attorney, all previously unrefunded fees (the attorney's fee and filing fee) that Cruz had paid to UpRight Law.   However, although Dominguez and UpRight Law assert that Cruz's money was fully refunded, there is insufficient evidence before the Court proving this alleged fact.   In October 2018 after the Motion was filed for example, Dominguez and UpRight Law assert that Cruz received a refund check from UpRight Law in the amount of $933.50.[35]   Next, UpRight Law's post-trial brief, to which Dominguez and Menditto also cite, contains a declaration by Menditto,[36] wherein Menditto's states that on January 23, 2019, UpRight Law mailed a check in the amount of $1,916.50 payable to "Bianca Cruz" to Cruz's attorney, Marcos Oliva of the Oliva Law Firm.[37] Attached to Menditto's declaration is a copy of the email sent to Mr. Oliva, counsel for the US. Trustee, and Catherine Curtis.[38]   However, UpRight Law failed to attach a copy of the check itself or provide confirmation from Cruz or her

---

[30] Min. Entry Dec. 6, 2018; ECF No. 71 at 60–61.
[31] *Id.* at 61.
[32] *Id.* at 62.
[33] *Id.* at 62–63.
[34] ECF No. 157 at 36, 42 (both parties concede that a statement of compensation should have been filed).
[35] *Id.* at 37.
[36] ECF Nos. 159–161.
[37] ECF No. 159-1.
[38] *Id.*

counsel that a check was received.  Menditto's declaration attached to UpRight Law's post-trial brief is the first time that a refund of $1,916.50 is brought to the Court's attention notwithstanding two hearings having been held after the date that the alleged check that was sent to Cruz.  Nevertheless, Dominguez and UpRight Law contend that the claim for relief is moot, and any opinion the Court might offer as to what the reasonable value of UpRight Law's services provided to Ms. Cruz would be advisory.

Dominguez and UpRight Law, however, conflate refunding Debtor's money with complying with Section 329(a). As stated supra, Section 329(a) mandates a strict duty of disclosure. That has not happened here and one may not escape liability for failure to comply with the plain meaning of the statute. The Court does not find Dominguez and UpRight Law's legal arguments or paltry evidence persuasive and thus, the Court's determination under § 329(a) is not moot. Accordingly, because Dominguez and Upright Law failed to timely disclose a statement of compensation for payments made undoubtedly in connection with Cruz's bankruptcy case, Dominguez and UpRight Law violated § 329(a). The Court must next determine whether those attorney's fees should be disgorged under § 329(b).

## 2. Cancellation of the Engagement Agreement and Disgorgement of Fees Pursuant to § 329(b)

The Court has authority to evaluate the reasonableness of attorney's fees and recover any fee that it finds excessive.[39]  Pursuant to § 329(b) and Rule 2017, if an attorney's compensation "exceeds the reasonable value" of the services, a court may cancel any such agreement or order the return of any such payment "to the extent excessive" to the entity that made such payment.[40] What constitutes reasonable value is a question of fact based on the specific circumstances of the

---

[39] *In re Bennett*, 133 B.R. 374, 377 (Bankr. N.D. Tex. 1991).
[40] 11 U.S.C. § 329(b); FED. R. BANKR. P. 2017; *see In re Whitley*, 737 F.3d 980, 986 (5th Cir. 2013).

case.[41]   An attorney's compensation may be reduced if the court finds that the work done was excessive or of poor quality.[42]   Courts have broad discretion in ordering disgorgement as a sanction to debtors' counsel's nondisclosure under § 329(a).[43]   As such, the Court must determine whether Cruz's payments subject to § 329(a) are excessive or of poor quality; and if so, whether Dominguez and UpRight Law should return any payment to the extent it exceeds the reasonable value of services rendered."[44]

As a preliminary matter, the Court recognizes that the Engagement Agreement between Cruz and UpRight Law is terminated.  Cruz has been represented by Mr. Oliva since August 6, 2018.[45]   Accordingly, any determination as to cancellation of the Engagement Agreement is moot.  The Court now turns its attention to the disgorgement issue.

On June 23, 2016, Cruz signed the Engagement Agreement with UpRight Law.[46]   Under the Engagement Agreement, UpRight Law was to prepare and file the petition, all required lists, schedules, and statements, as well as any amendments that may be necessary or appropriate.[47]   Notably, the Engagement Agreement bears the signature of an attorney from UpRight Law with whom Cruz never met.[48]   Cruz was advised by UpRight Law that bankruptcy services would be provided once Cruz paid the total retainer cost.[49]   In July 2017, Cruz completed her monthly payments to UpRight Law totaling $3,135, however, her Petition was not filed until about one

---

[41] *Id.*; 3 Collier on Bankruptcy P 329.04 (16th 2020).
[42] 3 Collier on Bankruptcy P 329.04 (16th 2020); *In re Lee*, 495 B.R. 107, 113–14 (Bankr. D. Mass. 2013) (explaining how the court may order disgorgement of all fees when "an attorney ineptly or incompetently renders services on behalf of debtors," or "may reduce fees if the work done was of poor quality").
[43] *Matter of Prudhomme*, 43 F.3d 1000, 1003 (5th Cir. 1995).
[44] *Id.*
[45] ECF No. 12.
[46] ECF No. 157 at 17.
[47] *Id.*
[48] *Id.*
[49] *Id.*

year later.[50] In that time, Cruz was offered little to no assistance with her bankruptcy by UpRight Law and Dominguez.

While Cruz and Dominguez disagree as to exactly what was said, it is clear that Cruz's communications with UpRight Law and Dominguez prior to the filing of her Petition were unavailing. Prior to the filing of her Petition, Cruz testified that she was suspicious about what was being accomplished with her case.[51] On July 16, 2018, Cruz contacted the Clerk of Court as well as the Oliva Law Firm, her present counsel, for assistance in determining whether her Petition had been filed, which it had not.[52] Additionally, in May 2018, a collection lawsuit was commenced against Cruz and Dominguez was aware of the suit, yet no action on behalf of Cruz was ever initiated by either Dominguez or UpRight Law.[53]

On July 18, 2018, roughly one year after Cruz paid the total retainer cost to UpRight Law, Dominguez filed Official Form 101 which encompassed a total of nine pages, including the creditor matrix, which is referred to herein by Dominguez as a "skeleton petition" on behalf of Cruz.[54] Dominguez made the filing without any bankruptcy schedules, statements, or disclosure of compensation.[55] Cruz's Petition was also filed without any proof that she had taken an approved credit counseling class, yet Cruz had taken two credit counseling classes by the time the Petition was filed.[56] Despite the subsequent orders and notices regarding the insufficiencies in the filing of Cruz's bankruptcy, Dominguez failed to file any extensions or discuss the insufficiencies with UpRight Law or Cruz.[57] On July 30, 2018, Cruz called UpRight Law and Dominguez to advise that she wanted to terminate the firm's representation of her and receive a

---

[50] *Id.* at 19.
[51] Min. Entry Nov. 2, 2018; ECF No. 59 at 37; *See* ECF No. 157 at 65.
[52] ECF No. 157 at 27.
[53] *Id.* at 24.
[54] *See* ECF No. 1.
[55] ECF No 157 at 29.
[56] *Id.* at 24.
[57] *See* Min. Entry Nov. 2, 2018; Min. Entry Dec. 6, 2018; ECF No. 157 at 31–32.

refund of her attorney's fees.[58]   Disconcertingly, it was not until UpRight Law's services had been terminated and the U.S. Trustee filed its Motion that Cruz purportedly received a refund check from UpRight Law in the amount of $933.50.[59]   Lastly, and as discussed more fully infra, Dominguez misled the Court when Dominguez intentionally altered official Form 101 signed by Cruz and wrote "7/18/18" on the Petition herself when Dominguez, in fact, knew it had not been dated by Cruz on that date.[60]

Given the gravity of the below standard of care exercised by Cruz's former counsel in this case, the Court renders the bankruptcy assistance provided by UpRight Law and Dominguez to be unequivocally valueless.   The Court does not take lightly the disgorgement of attorney's fees.   In this particular case, however, Cruz paid UpRight Law fees totaling $3,160 which consisted of $2,800 in attorney's fees, a $335 filing fee, and a $25 "reinstatement" fee.[61]   This was no easy task.   Cruz is divorced, has no dependents, and at the time of the hearings on the Motion, Cruz was unemployed.[62]   Since 1997, Cruz has been disabled because of her knee.[63] Cruz has had arthroscopic knee surgery for a torn ACL and knee replacement surgery.[64] Additionally, Cruz suffers from unstable angina, Stage 1 kidney failure, liver disease, asthma, COPD, diabetes, and sleep apnea.[65]   Finally, and at the time of the hearings on the Motion, Cruz's sources of income was limited to Social Security disability benefits, including Social Security Disability Insurance and Supplemental Security Income, and back child support payments.[66]

---

[58] ECF No. 157 at 34.
[59] *See* ECF No. 27; ECF No. 157 at 37.
[60] ECF No. 157.
[61] Min. Entry Nov. 2, 2018; ECF No. 59 at 15; U.S. Trustee Ex. 3.
[62] Min. Entry Nov. 2, 2018; ECF No. 59 at 7.
[63] *Id.*
[64] *Id.* at 8.
[65] *Id.* at 8–9.
[66] *Id.*

Where a debtor pays attorney's fees in full only to receive the filing of a partial, altered, and defective petition, and subsequently must hire another law firm to keep her case from being dismissed, the services rendered are of absolutely no value.  UpRight Law and Dominguez's fruitless representation of Cruz flies in the face of the safeguards that the bankruptcy laws of the United States have in place to protect debtors.  Accordingly, under its powers provided pursuant to § 329(b), the Court determines that the fees paid to UpRight Law in the amount of $2,825 are disgorged, and UpRight Law and Marina R. Dominguez must refund the sum of $1,891.50 (representing the fees Cruz paid UpRight Law, less amounts already refunded and filing fee) in good and sufficient funds, to Bianca Cruz.[67]

### 3.  Imposition of Civil Penalty Under § 526

Section 526 contains a set of debtor-protective provisions designed to restrict debt relief agencies from undertaking certain actions.[68]  Under § 526(a)(1), a debt relief agency shall not "fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title."[69]  A "debt relief agency" includes any person who provides legal representation in a bankruptcy proceeding to an assisted person, and attorneys are included in the definition of "debt relief agency."[70]  An "assisted person" is defined as "any person whose debts consist primarily of consumer debts and the value of whose non-exempt property is less than $192,450."[71]  Violations of § 526(a) are actionable under § 526(c)(5), which provides that if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated or

---

[67] The Court recognizes that Cruz received a refund check from UpRight Law in the amount of $933.50.
[68] *In re Santos*, 616 B.R. 332, 348 (Bankr. N.D. Tex. 2020).
[69] 11 U.S.C. § 526(a)(1).
[70] *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) ("Attorneys who provide bankruptcy assistance to assisted persons are "debt relief agencies" within the meaning of [BAPCPA]."); *see* 11 U.S.C. § 101(12A).
[71] 11 U.S.C. § 101(3).

engaged in a clear and consistent pattern or practice of violating § 526, the court may enjoin the violation of such section or impose an appropriate civil penalty against such person.[72] In summary, should a debt relief agency fail to perform all of the services promised to the debtor, the debt relief agency may be subject to a civil penalty imposed by a court. Here, the Court will evaluate the U.S. Trustee's request for the imposition of civil penalties against UpRight Law and Dominguez under § 526(c)(5)(B).

In this case, it is undisputed that both UpRight Law and Dominguez are debt relief agencies.[73] Additionally, Cruz squarely fits within the definition of an assisted person because her debts consist primarily of consumer debts and she does not have any non-exempt property.[74] As such, the relationship between UpRight Law and Dominguez with Cruz is subject to scrutiny under § 526.

The Supreme Court has interpreted § 526(a)(1) to mean that a debt relief agency is required to perform all services promised.[75] Under the Engagement Agreement, UpRight Law agreed to render, among others, the following services to Cruz:

> (b) when applicable, fil[e] the debtor's payment advices together with the Payment Advice Form or cover sheet;
>
> (e) assist[] the Client in complying with all of the requirements imposed by the Bankruptcy Laws and Rules;
>
> (f) prepar[e] and fil[e] the petition, all required lists, schedules, and statements, as well as any amendments that may be necessary or appropriate;
>
> (k) assist[] Client in complying with information requests by the Bankruptcy Trustee, the Court, or other parties; [and]
>
> (m) reviewing of Bankruptcy Petition and Schedules.[76]

---

[72] 11 U.S.C. § 526(c)(5).
[73] ECF No. 157 at 6, 13; *see* 11 U.S.C. § 101(12A).
[74] ECF No. 18.
[75] *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 761 (5th Cir. 2008).
[76] ECF No. 157 at 17–18.

Notwithstanding the promises made under the Engagement Agreement, UpRight Law and Dominguez wholly failed to perform most, if not all, the services assured to Cruz.  It is undisputed that Dominguez, acting as a partner of UpRight Law, filed solely Official Form 101 consisting of nine pages of the original petition or more commonly referred to as a "skeleton petition."  Moreover, Cruz's Petition was not only intentionally altered by Dominguez without Cruz's knowledge or consent, it was filed without any bankruptcy schedules, statements, disclosure of compensation, or any proof of an approved credit counseling class.[77]  Additionally, and even after filing the Petition, UpRight Law and Dominguez wholly failed to assist Cruz in complying with the subsequent orders and notices regarding the insufficiencies in Cruz's bankruptcy filing.[78]  UpRight Law and Dominguez did not talk to or take any affirmative action with respect to Cruz regarding any plan of action regarding compliance with the Court's orders.[79] Dominguez never provided Cruz with a copy of the Petition after filing.[80]  Additionally, Cruz testified that Dominguez repeatedly lied to her regarding a meeting of creditors.[81]  The Court finds Cruz's testimony credible.  Further, as previously determined by this Court, Dominguez and UpRight Law failed to comply with the requirements imposed by § 329(a) and Fed. R. Bankr. P. 2016(b) when they failed to file a disclosure of compensation.

Considering the totality of the circumstances, Cruz received no meaningful representation from UpRight Law or Dominguez.  The Engagement Agreement contains little more than a list of empty promises as Cruz had to obtain new counsel to salvage and advance her case. Accordingly, the Court finds that UpRight Law and Dominguez violated § 526(a)(1) by failing to

---

[77] *Id.* at 29.
[78] *Id.* at 36.
[79] *Id.*
[80] *Id.* at 25.
[81] *Id.* at 65.

perform all contractual services promised to Cruz.

Adding insult to injury, UpRight Law asserts that the "inadequate representation of Ms. Cruz, while regrettable, was an outlier."[82]  In its post-trial brief, UpRight Law argues that any civil penalties under § 526(c)(5) are inappropriate because there is no evidence that UpRight Law or Dominguez engaged in a "clear and consistent pattern or practice of violating [§ 526]."[83] First, the Court takes offense to UpRight Law's sentiment that the inadequate representation of Cruz was an outlier.   An attorney owes *each* client a duty of diligent and competent representation.[84] Public confidence in the judicial system demands the professional representation of each person and even a single failure to deliver adequate representation is cause enough to order relief.  This Court admonishes any suggestion that the mistreatment of one client should be ignored.  Next, UpRight Law misconstrues the reading of the statute. Section § 526(c)(5) is meant to be read disjunctively.  A court may impose sanctions if a person intentionally violated § 526 *or* engaged in a clear and consistent pattern or practice of violating [§ 526].[85]  Therefore, the Court need only find that UpRight Law and Dominguez intentionally violated § 526, which it does.

The actions taken in this case by UpRight Law and Dominguez in representing Cruz were not only substandard, they were intentional and deliberate.   Dominguez, without Cruz's knowledge or consent, knowingly and intentionally altered official Form 101 and filed the paltry petition despite needing more documents because Dominguez "wanted to try and calm [Ms. Cruz] down."[86]  She later acknowledged that she should have communicated better with Cruz

---

[82] ECF No. 159.
[83] *Id.*
[84] TX ST RPC Rule 1.01.
[85] 11 U.S.C. § 526(c)(5) (emphasis added).
[86] ECF No. 157 at 30.

and pressed her to provide the necessary documents more quickly in anticipation of filing.[87]
Both UpRight Law and Dominguez have acknowledged that Dominguez should have filed a
disclosure of compensation.[88]  Dominguez conceded it was her obligation to file the disclosure of
compensation and she understood that she did not need Cruz's consent to file it.[89]  In her
handling of Cruz's bankruptcy case, Dominguez feels she should have taken the initiative to call
and communicate better with Cruz, and does not hold Cruz responsible for the events that
transpired.[90]  Accordingly, the Court finds that UpRight Law and Dominguez intentionally
violated § 526(a)(1), triggering the imposition of civil penalties under § 526(c)(5)(B).  Next, the
Court must determine the appropriate amount to be imposed. The Court now turns its attention to
the U.S. Trustee's request for the imposition of civil penalties under § 526(c)(5)(B).

Section 526(c)(5)(B) does not prescribe any requirements or factors in determining the
amount of a civil penalty.  In the absence of such statutory guidance, the Court may exercise its
broad discretion while taking into account the Fifth Circuit's direction to "use the least restrictive
sanction necessary to deter the inappropriate behavior" when imposing disciplinary sanctions.[91]
In *In re Huffman*, the bankruptcy court found that a civil penalty under § 526(c)(5) in amount of
$28,000, which was roughly four times the fees which a Chapter 7 debtor had paid to the debt
relief agency for debt settlement services that it had promised but never provided, was an
appropriate civil penalty for the agency's clear and consistent pattern of misconduct.[92]  There,
the bankruptcy court determined that a penalty in an amount of four times the fees collected was
not so burdensome as to be punitive, but sufficient enough to serve as deterrent against the

---

[87] *Id.* at 67.
[88] *Id.* at 42.
[89] *Id.* at 37.
[90] *Id.* at 35.
[91] *In re Whitley*, 737 F.3d at 987.
[92] *In re Huffman*, 505 B.R. 726 (Bankr. S.D. Miss. 2014).

agency's future noncompliance with its obligations as debt relief agency.[93]

Here, while the U.S. Trustee does not propose a civil penalty amount in its Motion, the U.S. Trustee contends that the penalty "should be in an amount determined by the Court taking into consideration all the relevant factors including the misrepresentations made to Ms. Cruz, [UpRight Law and Dominguez's] ability to pay, and the harm to Ms. Cruz including, but not limited to, the fees she has incurred to Mr. Oliva."[94] Given that the Court here has not determined that there was any clear and consistent pattern of misconduct, an award of four times the fees collected or more is not warranted. Instead, the Court finds that a civil penalty of three times the amount paid by Cruz to UpRight Law is appropriate. In reaching this conclusion, the Court has taken into consideration that UpRight Law and Dominguez have each taken some level of responsibility for their actions in this case and recognize that Cruz's representation was, as stated by UpRight Law, inadequate. Nonetheless, representation in contravention of the spirit of the Code is not without consequence.

The civil penalty awarded in this case takes into account, as discussed herein, misrepresentations made to Cruz, UpRight Law and Dominguez's ability to pay, and covers her expenses incurred to Mr. Oliva in the amount of $1,765.[95] Cruz paid UpRight Law a total sum of $2,800 in fees plus a $25 reinstatement fee for a total of $2,825.[96] Therefore, a civil penalty of $8,475, or three times the amount of fees paid by Cruz, is appropriate. Further, since an attorney's misconduct may also be imputed to her law firm, this Court imputes the misconduct of Dominguez as a partner to UpRight Law in imposing civil penalties.[97] Accordingly, this Court finds that pursuant to § 526(c)(5)(B), a civil penalty in the amount of $8,475 shall be imposed on

---

[93] *Id.*
[94] ECF No. 27.
[95] ECF No. 25.
[96] ECF No. 157.
[97] *See In re DePugh,* 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009).

both Dominguez and UpRight Law, jointly and severally, and paid to Cruz.

It is the Court's sincere hope that the civil penalty imposed in this case serves as a wakeup call to Dominguez and UpRight Law and to all who represent debtors in the Southern District of Texas that this type of substandard representation of already financially strapped debtors will not be tolerated.

### 4.   Imposition of Sanctions Under § 105 and the Court's Inherent Authority

Section 105(a) of the Code, which codifies the equitable powers of the bankruptcy court, provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[98]   Courts may rely on § 105 to sanction improper conduct.[99]   In addition, the bankruptcy court has "the inherent power to guard the practice of attorneys who appear in that court."[100] Therefore, bankruptcy courts have broad leeway in determining an appropriate sanction for unethical behavior.[101] Here, the U.S. Trustee's Motion requests that pursuant to § 105(a) and its inherent authority, the Court order UpRight Law and Dominguez disgorge all compensation received from Cruz, to cancel the Engagement Agreement, and to provide any further relief as the Court deems necessary to deter them from repeating such misconduct in the future.

Here, the Court has already ordered the disgorgement of fees paid by Cruz to UpRight Law in the amount of $2,825 pursuant to § 329(b) and imposed a civil penalty on UpRight Law

---

[98] 11 U.S.C. § 105.

[99] *See In re Dobbs*, 535 B.R. 675, 691 (Bankr. N.D. Miss. 2015) ("The clear language of 11 U.S.C. § 105(a) grants this Court significant equitable powers as well as latitude in framing the relief necessary to carry out both the specific provisions of the statute as well as its philosophical underpinnings.");   *see In re DePugh*, 409 B.R. at 125 (Bankruptcy court, in exercise of its power to enter "necessary or appropriate" orders, has authority to issue sanctions against parties and their attorneys to effectuate provisions of the Bankruptcy Code. 11 U.S.C. § 105(a)).

[100] *In re Whitley*, 737 F.3d at 987; *see Chambers v. NASCO, Inc.,* 501 U.S. at 43–46 (a court has the inherent power to police the conduct of litigants and attorneys who appear before it).

[101] *Matter of Prudhomme*, 43 F.3d at 1005.

in the amount of $8,475.[102]   While this Court recognizes that pursuant to § 105(a) and its inherent authority the Court may impose further sanctions, it declines any invitation to do so.[103] This Court exercises the statutory authority and Rules examined herein to effectuate the disgorgement and imposition of civil penalties, and the Court finds that the remaining consequences of the actions taken by counsel in this case are best addressed through referrals to the Texas State Bar and the Chief Judge of the United States District Court of the Southern District of Texas, which will be discussed in greater detail in the following section.  As the issues brought forth in the U.S. Trustees Motion have been addressed, the Court now turns its attention to its Show Cause Order.

### 5.  The Court's Show Cause Order Regarding UpRight Law's Exhibit No. 11

Perhaps most troubling to the Court was Dominguez's handling of the Petition.  During trial on November 2, 2018, Cruz was called to the witness stand by the U.S. Trustee and was sworn in by the Court.  Exhibit No. 5 (UpRight Law's Exhibit No. 11) was offered by the U.S. Trustee and was admitted into evidence. Exhibit No. 5 is an electronic copy of the Petition purportedly signed and dated by Cruz on July 18, 2018.  When presented with Exhibit No. 5 the following exchange took place between Mr. Duran, for the U. S. Trustee ("*Duran*") and Cruz:

*Nov. 2, 2018 Hr. 6–7*

Q: All right.  Would you turn to U.S. Trustee Exhibit No. 5?  Is that the Bankruptcy Petition that was filed on your behalf?

A: Yes. But it's dated July 18 and I did not do this paperwork on the 18th.

---

[102] UpRight Law and Marina R. Dominguez must refund the sum of $1,891.50 (representing the fees Cruz paid UpRight Law, less amounts already refunded and filing fee) in good and sufficient funds, to Bianca Cruz.

[103] *See Chambers v. NASCO, Inc.*, 501 U.S. at 32 (If all of litigant's conduct is deemed sanctionable, and conduct sanctionable under rules is intertwined with conduct that only court's inherent power can address, court need not first apply rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct.); *see also In re Cochener*, 360 B.R. 542, 570 (Bankr. S.D. Tex.) (although inherent powers are used when the conduct is not subject to the Rules, "neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules.").

Q: Okay.  But it was filed on July 18th of 2018; is that correct?

A: Yes, sir.

*Nov. 2, 2018 Hr. 30: 9–25*

Q:  Did you sign any documents when you met with Ms. Dominguez in December of 2017?

A:  We signed the paperwork that -- on everything that we had just filled out the worksheets.

Q:  You signed the worksheets.

A:  Yes.

Q:  Did Ms. Dominguez provide you with a copy of any documents you had signed at that meeting in December of 2017?

A:  That I remember, no.

Q:  In December of 2017, did Ms. Dominguez make any representations to you about when your Bankruptcy Petition would be filed?

A: She said in -- after the new year, after the holidays.

Q: And what did you understand that response to mean?

A: That she was going to turn in the paperwork so I could get a court date for my bankruptcy.

*Nov. 2, 2018 Hr. 31: 21–24*

Q: How many times did you meet in person with Ms. Dominguez from December of 2017, the first time you met her, to the time you -- to the end of July of 2018?

A:  I met her twice, once in December and once in February.

*Nov. 2, 2018 Hr. 33*

Q:  Did you sign any documents in February of 2018?

A:  To my recollection, no.

*Nov. 2, 2018 Hr. 35*

Q:  Do you recall signing any documents for Ms. Dominguez in either March or April of 2018?

A:  No. After February, I never saw her again.

Q:  Okay. Did she ever send you something via email –

A:  No.

Q:  -- or fax for you to sign, scan and send back to her?

A:  No. I sent -- I faxed over two different documents to her, one was in May where I was served some papers from Amazon about being sued and then another in July that I faxed over to her.

Q:  Okay. All right. So you were sued in May.

A:  Yes, I was served with papers that I was being sued.

Q:  And this was a suit to collect a debt based on some charges you had made on a credit card account.

A:  Yes.

*Nov. 2, 2018 Hr. 36*

Q:  Okay. June 2018, did you have any communications with Ms. Dominguez?

A:  Same thing about the court date. She had given me a court date of June the 21st, I think. And before, same thing, I called her and it was being moved for July. She wasn't too clear or too sure of the date whether it would be the July 19th or 26th was going to be my court date.

*Nov. 2, 2018 Hr. 37*

Q:  What about July, did you have any communications with Ms. Dominguez in July of 2018?

A:  Early July because I was supposed to have my Creditors' Meeting either the 19th or the 26th. I called to see which one was going to be the date and to get a time and when I called, the clerk said that the phone -- the number was no longer in service. And that's when I called UpRight Law.

*Nov. 2, 2018 Hr. 38*

Q: In December, she had told you that your case would be filed after the holidays, correct?

A: Yes.

Q: And you believed that she had filed the Bankruptcy Petition commencing your case, correct?

A: Yes. Yes.

Q: And you believed that in January, February, March, April, May, June and July, correct?

A: Yes.

Q: All you were trying to figure out was, "When is my Creditors' Meeting," right?

A: Yes, sir.

Q: But she keeps giving you different dates.

A: Yes.

Q: And it never occurs.

A: No.

Q: And you don't get any notices from the Court?

A: No.

*Nov. 2, 2018 Hr. 44*

Q: Around that time, the 16th and 17th, did you have any communications with Ms. Dominguez?

A:  Yes, I did. I called her and I asked her and she said, "Yes," that she had done the paperwork already, that she had turned in everything. And I asked her for the case number and she said she would have to get back to me on that because she wasn't in the office yet.

*Nov. 2, 2018 Hr. 45*

Q:  How did you interpret what Ms. Dominguez told you, what did it mean to you?

A: It was lies. She was lying to me because I already knew. The courts had already told me there was no case number. Nothing had been filed to the courts. And even though I was asking her, she was still telling me the same thing that everything had been done.

*Nov. 2, 2018 Hr. 45–46*

Q: Turn to UpRight Law Exhibit 11.

A: Okay.

Q: Is that the Petition that was filed on January -- I mean, on July 18th, 2018?

A: I am not sure. I was not there when this was done.

Q: Take a look at page 7 of Exhibit 11 and tell the Court whether or not that is your signature.

*Nov. 2, 2018 Hr. 47*

Q: Tell the Court whether or not that's your signature?

A: It looks like my signature, but it's not my signature. And I was not there on the 18th to sign anything.

Q: So you didn't sign anything on July 18th, 2018?

A: No.

Q: And it's not your signature?

A: No.

Q: Do you know whose signature that is?

A: No.

Q: Do you know whose writing that is under "executed on 7/18/18"?

A: No.

Q: Do you write your "7s" like that?

A: No.

Q: Do you write your "8s" like that?

A: Sometimes. But, no, most of the time a six.

*Nov. 2, 2018 Hr. 48*

Q: Is it your testimony here today that you didn't go to Ms. Dominguez's office on July 18th, 2018 for the purpose of signing UpRight Law Exhibit 11?

A: No, I did not.

At the December 6, 2018 continued hearing, Dominguez was called to the witness stand by Duran and was sworn in by the Court. At that hearing, the following exchange took place between Duran and Dominguez:

*Dec. 6, 2018 Hr. 30*

Q: So you called Ms. Cruz.  Would that have been first part of July of 2018?

A: No, it was July 18th of 2018.

Q: So that was the first phone call, it was July 18th?

A: Yes.

Q: All right. Had her Bankruptcy Petition already been filed that day?

A: No, it had not. I filed it while I was talking to her on the phone. She was adamant that she wanted a case number.

*Dec. 6, 2018 Hr. 52*

Q: On Exhibit 11, page 7, I mean you heard Ms. Cruz testify that that's not her signature, correct?

A: That's correct.

Q: All right. Is it your position that it is her signature?

A: Yes, she signed it in front of me.

Q: When did she sign it in front of you?

A: She signed it in June.

Q: Do you recall the exact date?

A: No, I'm sorry, I don't.

Q: All right. Whose writing is it under her signature when it says, "Executed on," and it's got the date 7/18?

A: That's my writing.

*Dec. 6, 2018 Hr. 53*

Q: Why would you write in that date?

A: That was the date that I filed it.

Q: Okay. And that one purported to give the impression that Ms. Cruz had signed it on that particular date, 7/18 -- July 18, 2018, correct?

A: Yes.

At the conclusion of Ms. Dominguez's testimony, the Court ordered that Ms. Dominguez provide the Court with the original of Exhibit 11 containing the original wet signatures and dates of the parties.[104]  Exhibit 11 was never produced to the Court, therefore on December 27, 2018, the Court issued its Show Cause Order as to why Menditto, for UpRight Law, and Dominguez should not be held in contempt of court.[105]  After some delay, the Court, inter alia, set a hearing on its Show Cause Order for March 6, 2019.

At the March 6, 2019 hearing, it came to the Court's attention that in February 2018, Cruz and Dominguez reviewed a petition prepared by Dominguez.[106]  The petition shown to Cruz at that meeting contained an electronically generated date printed on the document.[107]  But Dominguez did not have Cruz sign the petition at the meeting in February, only review it.[108]  Dominguez then testified as to the Debtor's wet signature on the Petition.[109]  Notwithstanding her testimony at the December 6, 2018 hearing,[110]  Dominguez testified that she wrote in the date in question on the original Petition herself.[111]  What follows is Dominguez's sworn testimony regarding that event:

*Mar. 6, 2019 Hr. 52*

A: Your Honor, when I gave my testimony on December the 6th in this court -- in your court regarding the Trustee's Motion, I did state that the Voluntary Petition signed by Ms. Bianca Cruz had been dated at the same time.  However, when I looked back at the documents to find the Petition, I remembered something different.  And . . .  there was a delay in me presenting this

---

[104] Min. Entry Dec. 6, 2018; ECF No. 71 at 114.
[105] ECF No. 72.
[106] Min. Entry Apr. 26, 2019; ECF No. 120 at 44.
[107] *Id*. at 60.
[108] *Id*. at 45.
[109] Min. Entry Dec. 6, 2018.
[110] *Id*. (When asked by the Court, "[a]nd do you still possess the original document, the wet signature for the client?" Dominguez answered, "Yes, I should have it, Your Honor.").
[111] *Id*. (Dominguez testified that "The date however when I presented the original to Mr. Menditto in December, I had then gone back and placed the date on it, on top of the White Out.").

document to Mr. Menditto.

*Mar. 6, 2019 Hr. 53*

A: I don't really have any problem with [Menditto's] testimony. I pretty much agree with everything that he stated. But I wanted to offer to you my story as to what happened. When I found the document, the original document, the date itself had been whited out. And what I have done was when Ms. Cruz signed this document, I didn't print out a new form for her to sign. I had that old draft that I had prepared for her back in February and I had whited it out to get her to sign it. So, she signed it, did not date it. I signed it and dated it. When I was preparing document to give to Mr. Menditto, I noticed that the original at that time did not have a date on it. I made a copy of it -- and I don't really have an explanation as to why I did it like this, but this is the truth as to how it happened. I made a copy of it and I dated the copy and that's what I forwarded it to Mr. Menditto. The signature of Bianca Cruz is authentic, that's the same. The date however when I presented the original to Mr. Menditto in December, I had then gone back and placed the date on it, on top of the White Out. I understand what I did was not -- it wasn't the right thing to do, but I wasn't thinking correctly. I made a bad decision. I'm here in front of you today to take full responsibility for my actions, Your Honor. I apologize to this Court for doing that.

Upon hearing this, the Court immediately advised Dominguez of her rights under 5th Amendment of the United States Constitution and adjourned the proceedings in order to permit Dominguez an opportunity to seek and obtain independent counsel and reset the hearing to April 26, 2019.[112] At the April 26, 2019 hearing, Dominguez, having obtained separate counsel, testified as to the events surrounding the preparation of the Petition.

At some point after the meeting between Dominguez and Cruz in February, Dominguez whited-out the February date printed on the document.[113] In June 2018, Dominguez had Cruz sign the petition that was originally printed in February.[114] The petition signed by Cruz in June was not dated.[115] It still contained the February date underneath the white out made by Dominguez.[116] This document became the Petition filed by Dominguez on behalf of Cruz on

---

[112] *Id.*
[113] *Id.* at 44.
[114] ECF 157 at 54.
[115] Min. Entry Apr. 26, 2019; ECF No. 120 at 61.
[116] *Id.* at 43, 61.

July 18, 2018.[117]  Next, in preparation for the November 2, 2018 hearing, Dominguez made a copy of the Petition that still contained a whited-out date.[118]  On the copy of the Petition, Dominguez wrote "7/18/18" on the line that says, "Executed on," and sent it to Menditto.[119]  That copy was used for UpRight Law's Exhibit 11 at the November 2, 2018 and December 6, 2018 hearings.[120]

After Dominguez and Menditto were tasked with producing the Petition containing Cruz's wet signature following the December 6, 2018 hearing, Dominguez located the Petition in her office.[121]  When found by Dominguez, the date on the Petition was still whited out.[122]  Dominguez went back to the original Petition with the whited out date and once again wrote "7/18/18" on top of the white out.[123]  Dominguez next made a copy of the Petition after she had written in the date and sent the copy to Menditto, representing that the document was Cruz's original wet signature Petition.[124]  Dominguez completed her testimony as to her actions in this case and all hearings were concluded on April 26, 2019.  Dominguez dated the Petition herself in the place of Cruz not once, but twice.[125]

In summary, the falsified date was used as an exhibit in the first two hearings on the U.S. Trustee's Motion, and Dominguez wrote in the date herself on the original Petition again after the Court ordered Dominguez and Menditto to produce the Petition containing Cruz's wet signature.  Dominguez's actions were misleading to the Court because it purported to say that Cruz signed it on July 18, 2018, when Dominguez, in fact, knew it had not been signed by Cruz

---

[117] ECF No. 1.
[118] Min. Entry Apr. 26, 2019; ECF No. 120 at 46.
[119] *Id.* at 8; ECF No. 157 at 55.
[120] *Id.* at 46; *see* Respondent's Ex. 11.
[121] *Id.* at 18.
[122] *Id.* at 42–43.
[123] *Id.* at 46; ECF No. 157 at 54.
[124] *Id.*
[125] *See* Background Facts section.

on that date.[126]   While Dominguez acknowledged that she should have handled Cruz's case differently, Dominguez's misrepresentations to her client and to this Court are not only reprehensible, but unethical.   Additionally, Dominguez's misrepresentations to this Court not only lacked candor, it was absolute perjury.   The Show Cause Order required that Dominguez and Menditto of UpRight Law turn over all original documents related to Exhibit No. 11, Cruz's Petition containing her wet signature and date.   Cruz's Petition containing her wet signature and date, albeit after the Court had to resort to the issuance of a show cause order, was in fact ultimately turned over to this Court.   Accordingly, Dominguez and Menditto are not held in contempt as the Show Cause Order was eventually satisfied.   Dominguez's actions in relation to Exhibit No. 11, however, are not without consequences.   Therefore, in light of the actions taken by Dominguez in this case, the Court will refer the matter and provide a set of recommendations to the Chief Judge of the United States District Court for the Southern District of Texas and the State Bar of Texas.

### a.   Rule 3.03. Candor Toward the Tribunal

Rule 3.03 of the Texas Disciplinary Rules of Professional Conduct provides, in part, that:

(a)  A lawyer shall not knowingly:

    (1) make a false statement of material fact or law to a tribunal;
    . . .
    (5) offer or use evidence that the lawyer knows to be false.

Here, lacking any semblance of candor, Dominguez made false statements of material fact to this Court by not only falsifying the date on Cruz's Petition in an exhibit admitted to this Court, but falsifying the date on the Petition itself prior to the March 6, 2019 hearing. Dominguez was not only aware that she falsified the date and that such altered document could and in fact did mislead the Court, Dominguez did not admit her wrongdoing until after two

---

[126] ECF No. 157 at 55.

hearings and the issuance of a Show Cause Order.[127]   Courts have found counsel in violation of Rule 3.03 for similar conduct.[128]   As such, the Court finds that Dominguez's conduct discussed at length herein violates Rule 3.03(a)(1) and (5).[129]   As a result, the Court makes the following referrals and recommendations.[130]

### b. Charges of Misconduct Warranting Discipline & Referral To The Chief Judge Of The United States District Court For The Southern District Of Texas

Pursuant to Rule 5 of the Rules of Discipline of the United States District Court for the Southern District of Texas, charges that an attorney that has engaged in conduct which might warrant disciplinary action shall be brought to the attention of the District Court by a writing addressed to the Chief Judge with a copy to the Clerk of the Court.[131]   Therefore, this Court hereby directs the Clerk to deliver a copy of this opinion and the related judgment to the Hon. Lee Rosenthal, Chief Judge of the United States District Court for the Southern District of Texas, for further proceedings in accordance with Rule 5.   In so doing, the Court provides the following recommendations.

In *In re Stomberg*, a sister court issued sanctions against a debtor's attorney where the attorney electronically filed certain Schedules and a Statement of Financial Affairs without first

---

[127] *See* ECF No. 157.

[128] *See e.g. In re Zuniga*, 332 B.R. 760, 783 (Bankr. S.D. Tex. 2005) (Counsel made false statements of material fact.  The 2016(b) Disclosure inaccurately represented that the fee would be paid to counsel and he would share the fee with another attorney.); *see In re Santos*, 616 B.R. at 354 (Court found that each of an attorney's actions constituted a violation of Rule 3.03.).

[129] TX ST RPC Rule 3.03.

[130] The Local Rules of the United States District Court for the Southern District of Texas apply to practice before the bankruptcy court. LOC. R. BANKR. P. 1001-1(b). District Court Local Rule 83.1L provides that the Rules of Discipline contained in Appendix A to the Local Rules govern attorney conduct in the Southern District of Texas. Rule 1A of Appendix A provides that the minimum standard of practice in the Southern District of Texas shall be the Texas Disciplinary Rules of Professional Conduct. *See In re Proeducation Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009). Rule 1B of Appendix A provides that a violation of the Texas Disciplinary Rules of Professional Conduct shall be grounds for disciplinary action although the Court is not limited by the Texas rules. *See id.*

[131] *See* Southern District of Texas Rules of Discipline.

obtaining the debtor's original signature and forged the debtor's electronic signature.[132] However, the attorney had filed debtor's petition with debtor's consent.[133] There, the court limited its discipline to monetary sanctions, declining to suspend or disbar the attorney.[134] In *In re Dobbs*, the bankruptcy court issued sanctions after an attorney forged a former client's signature on a Chapter 13 petition and filed a case in the purported debtor's name without notice to and without authorization from the purported debtor.[135] In that case, the attorney also had debtor's estranged wife take a credit counseling course in place of debtor, filed fabricated documents with the bankruptcy court, and displayed a pattern of conduct in other cases and continuously refused to show true remorse for his misconduct.[136] Ultimately, the attorney was permanently disbarred from the practice of law in the bankruptcy court for the Northern District of Mississippi, where the case was filed.[137] In *In re Santos*, an attorney forged the debtor's signature on the petition and filed the case without the debtor's authorization. In considering sanctions, the bankruptcy court in the Northern District of Texas determined that there is a *notable* difference between forging signatures on schedules in a bankruptcy case that the debtor has already authorized and forging a signature on a petition to file an unauthorized bankruptcy case, as the attorney in that case had. As such, the bankruptcy court issued an indefinite suspension of practice against the attorney with the possibility of reinstatement after two years, disgorgement of fees, and 15 hours of ethics continuing legal education.[138]

Here, while Dominguez's misconduct does not rise to the level of that seen in *In re Dobbs* and *In re Santos*, Dominguez's actions are nonetheless subject to a combination of

---

[132] *In re Stomberg*, 487 B.R. 775, 780 (Bankr. S.D. Tex. 2013).
[133] *Id.* at 782.
[134] *Id.* at 780.
[135] *In re Dobbs*, 535 B.R. at 675.
[136] *Id.*
[137] *Id.*
[138] *In re Santos*, 616 B.R. at 355–77 (Bankr. N.D. Tex. 2020).

monetary sanctions and suspension.  Dominguez violated multiple bankruptcy statutes and rules[139] as discussed herein, and clearly lacked candor to the Court by not only falsifying the date on Cruz's Petition in an exhibit admitted to this Court and testifying about its authenticity, but falsifying the date on the Petition itself prior to the March 6, 2019 hearing.[140]  In addition, although Dominguez had some level of implicit of approval in filing Cruz's case similar to the attorney in *In re Stomberg*, Dominguez failed to keep Cruz adequately informed throughout her representation of Cruz, executed a forgery upon Cruz's Petition and deliberately misled this Court about the Petition's authenticity. Therefore, this referral is made with the recommendation that Marina R. Dominguez be suspended from practice before this Court for a period of one year and that before she is permitted readmission she be required to take a minimum of fifteen (15) hours of ethics in continuing legal education.

### c.   Referral to the State Bar of Texas

Marina R. Dominguez is a licensed Texas attorney.  Inasmuch as the conduct set forth above involved actions taken in the United States Bankruptcy Court for the Southern District of Texas, the Court refers this matter to the Office of Chief Disciplinary Counsel for the State Bar of Texas to take any action that it deems appropriate.  The Clerk shall deliver a copy of this opinion and the associated judgment to the Office of Chief Disciplinary Counsel for the State of Texas.

### d.  The Chief Bankruptcy Judge

The Clerk shall also deliver a copy of this opinion and the associated judgment to the Hon. David Jones, Chief Judge, United States Bankruptcy Court, Southern District of Texas.

---

[139] *See* 11 U.S.C §§ 329, 526; *see also* FED. R. BANKR. P. 2016.
[140] TX ST RPC Rule 3.03.

### e.  Show Cause Hearing

The Court will set a hearing for UpRight Law[141] and Marina R. Dominguez to appear and show cause why each should be permitted to practice before the undersigned judge.

### III.   CONCLUSION

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.


SIGNED 08/27/2020.

_____
Eduardo V. Rodriguez
United States Bankruptcy Judge

---

[141] Deighan Law, LLC, f/k/a Law Solutions Chicago LLC d/b/a UpRight Law LLC, Allen Chern Law LLC.